**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

REV. DR. WILLIAM DAVID LEE,     )
                              )
     Plaintiff,            )
                              )
     v.                    )     Civil Action No. 15-1599
                              )     Hon. Nora Barry Fischer
SIXTH MOUNT ZION BAPTIST CHURCH     )
OF PITTSBURG d/b/a SIXTH MOUNT     )
ZION MISSIONARY BAPTIST CHURCH,     )
et al.,                    )
                              )
     Defendants.         )
                              )

## MEMORANDUM OPINION

### I.     INTRODUCTION

This case involves an employment dispute between a Pastor and the Church that hired him to lead it and then terminated his employment. Specifically, Rev. Dr. William David Lee ("Plaintiff," "Rev. Lee" or "Pastor") sued for breach of a written contract of employment, naming as defendants the Sixth Mount Zion Baptist Church of Pittsburg[1] d/b/a the Sixth Mount Zion Missionary Baptist Church ("Defendant" or "the 'Church'"), as well as eleven of its deacons, whom he sued individually.[2] (Docket No. 1). Presently before the Court is Plaintiff's Motion for Summary Judgment. (Docket No. 76). The Court held argument on the matter on May 12, 2017. (Docket No. 92).[3]

---

[1] The spelling of Pittsburg is as indicated in the Complaint and in the 1915 Charter of Incorporation. (Docket No. 1 and Exhibit A).

[2] The Court previously granted the Motion for Judgment on the Pleadings (Docket Nos. 43, 55) filed by the eleven individual defendants in this matter, Timothy Ralston, Nathaniel Young, Geoffrey Kevin Johnson, Rochelle Johnson, Alexander Hall, Raymond Jackson, James Grover, Arthur Harris, Jerome Taylor, Tommie Nell Taylor, and Roy Elder (collectively "individual defendants").

[3] The transcript is filed of record at Docket No. 93.

Plaintiff's Motion has been fully briefed by the parties in accordance with Local Rule 56. After reviewing the filings of the parties, including the Complaint, the Church's Amended Answer, Lee's Motion for Summary Judgment and Brief in Support, the Church's Response in Opposition, Lee's Concise Statement of Material Facts, the Church's Responsive Concise Statement of Material Facts, and the transcript of oral argument, and considering the standards for granting such a motion under Federal Rule of Civil Procedure 56(b) and the matters addressed before the Court at the hearing on May 12, 2017, including matters raised and addressed pursuant to Federal Rule of Civil Procedure 56(f), namely application of the ministerial exception under the First Amendment's Free Exercise Clause and excessive entanglement under the First Amendment's Establishment Clause, Plaintiff's motion will be denied and this matter will be dismissed for the following reasons.

## II. FACTUAL BACKGROUND[4]

The Court must first address a matter regarding the parties' filings related to the concise statement of facts before addressing the relevant facts for purposes of the motion for summary judgment. Lee, as the moving party, filed his concise statement of material facts. The Church, as the nonmoving party, responded admitting certain facts, denying certain facts, and providing its own concise statement of facts in response with supporting documentation. Lee, for whatever reason, did not file <u>any</u> response to the Church's concise statement of facts.

Local Civil Rule of Court 56.B.1 requires that the party moving for summary judgment file a separate concise statement of material facts and that the party cite "to a particular pleading, deposition, answer to interrogatory, admission on file or other part of the record supporting the

---

[4] The factual background is from the undisputed evidence of record, including the Concise Statements of Material Facts and admissions pursuant thereto; evidence not properly disputed on the record; and the disputed evidence of record viewed in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986).

party's statement, acceptance, or denial of the material fact." LCvR 56.B.1. The moving party also must file an appendix with the documents supporting that party's concise statement of material facts. LCvR 56.B.3. The opposing party is to provide a separately filed concise statement admitting or denying the facts in the moving party's concise statement, LCvR 56.C.1.a, setting forth the basis for any denial with reference to the record, LCvR 56.C.1.b, and providing any additional material facts that are necessary for the court's ruling on the motion. LCvR 56.C.1.c. Local Civil Rule of Court 56.E specifically provides that the facts claimed to be undisputed and material in "the moving party's Concise Statement of Material Facts <u>or in the opposing party's Responsive Concise Statement</u>, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted <u>unless specifically denied or otherwise controverted by a separate concise statement of the opposing party</u>." LCvR 56.E (emphasis added).

The Church supported their concise statements of fact with sufficient evidentiary materials in their appendix in support of their denials and their stated facts, (Docket Nos. 115, 121), in compliance with Local Civil Rule of Court 56.B.1 and 56.B.3. Rev. Lee, however, did not respond to the Church's supported statement of facts. Under these circumstances, in accordance with Local Civil Rule of Court 56.E, and for purposes of the present motion for summary judgment, the Church's Fact Nos. 23-49 provided in its response to Lee's Facts and the additional facts provided in response to Lee's Fact Nos. 6, 7, 11 and 13 will be deemed admitted by Rev. Lee. *See 714 Ventures, Inc. v. Nat'l Oilwell Varco, L.P.,* No. CV 15-925, 2016 WL 5919934, at *1 n. 1 (W.D. Pa. Oct. 11, 2016) (deeming facts admitted for violation of Local Rule 56.E).

According to the Complaint and Charter of Incorporation attached as Exhibit A to the Complaint, the Church is a longstanding church in Pittsburgh, received its original Charter of Incorporation in 1915, (Docket No. 1, Ex. A), and is overseen by its Pastor and Deacon Board. (Docket No. 1 at ¶ 19). On December 1, 2012 the Deacon Board recommended Rev. Lee for the position of Pastor. (Docket No. 83 at ¶ 1; Docket No. 87 at ¶ 1). The Church's Findings Committee presented a "Point-by-Point Report" on Rev. Lee and the Church's Pulpit Committee recommended Rev. Lee for the position of "Pastor of the Church" at a December 1, 2012, meeting called by the Findings Committee. (Docket No. 83 at ¶¶ 2, 3 & Ex. A; Docket No. 87 at ¶¶ 2, 3). On December 12, 2012, the Church voted unanimously to accept Rev. Lee as Pastor of the Church, (Docket No. 83 at ¶ 4 & Ex. A [76-3 at 2, 5]; Docket No. 87 at ¶ 4). On or about March 2013, the Church retained the legal services of Attorney Candace Ragin ("Attorney Ragin") of the Law Firm of Candace Ragin, LLC, to provide various legal services to the Church, including the drafting of an agreement between the Board of Deacons and the Church's new Pastor, Rev. Lee, regarding his employment ("Employment Agreement" or "contract"). (Docket No. 83 at ¶ 5 & Ex. C; Docket No. 87 at ¶ 5). On March 20, 2013, the Employment Agreement was executed by Rev. Lee, Timothy Ralston, then Chairman of the Church's Deacon Board, and Jimmy Barley, then Trustee of the Church. (Docket No. 83 at ¶¶ 6, 11 & Ex. C; Docket No. 87 at ¶¶ 6, 11, 23). The parties understood and agreed that the Church congregation ("the Congregation") had to approve the Employment Agreement in order for it to become effective. (Docket No. 83 at ¶ 6; Docket No. 87 at ¶¶ 6, 24; Docket No. 88-1 E).

The Employment Agreement[5] contains the following pertinent provisions:

2.      Employment and Duties

---

[5] The formatting of the actual Employment Agreement is not uniform and the Court has included its provisions as in the original.

The pastor's duties and responsibilities under this Agreement ("PASTORAL DUTIES AND RESPONSIBILITIES") are as follows:

2.1    The pastor will perform all duties assigned to him by the CHURCH from time to time, including but not limited to . . . sacerdotal functions and administrative duties . . . .

2.2    The pastor shall devote such of his time and energies as may be necessary for the performance of all PASTORAL DUTIES AND RESPONSIBILITIES.

2.3    As the CHURCH finds its headship under the Lord Jesus Christ and in its pastor, the pastor will be the chief executive officer (CEO) of the Board and has sole authority and control of hiring/firing and supervising all CHURCH'S paid staff.

Pursuant to his supervisory authority, the pastor will also oversee and govern the invitation of any speaker, teacher, or minister to any meeting or gathering held by the CHURCH. . . .

2.4    The Pastor will be the ex-officio chairm[an] of the CHURCH Board of Deacons, and ex-officio chairm[an] of all standing Church boards, auxiliaries and/or committees throughout the term of this Agreement. . . .

2.5    The pastor shall lead the pastoral ministries of the CHURCH and shall work with the Deacons and CHURCH staff in achieving the Church's mission of proclaiming the Gospel to believers and unbelievers.  The pastor shall be a member of the CHURCH, and serve as moderator at business meetings of the members.

## 3.    Term and Renewal

3.1    The initial term of this AGREEMENT shall be for a period of twenty (20) years, beginning on <u>December 1, 2012</u> and expiring on <u>December 31, 2013</u> ("INITIAL TERM"), subject to the termination provisions of this AGREEMENT.

3.2    Unless the CHURCH, after congregational vote, notifies the pastor in writing, at least (90) days before the expiration of the INITIAL TERM that the CHURCH does not desire to extend the terms of the AGREEMENT, the terms of this AGREEMENT shall automatically extend for an additional period of ten (10) years.

****

## 7.    REPRESENTATIONS AND WARRANTIES

DR. LEE warrants and represents that he:

a)    Is a minister of the gospel in compliance with the requirements of CHURCH and in compliance with federal, state and local laws;

b)    Is an experienced pastor, having pastor [sic] churches other than the CHURCH and is qualified to serve as the pastor of the CHURCH;

c)    Will abide by the employment policies and procedures existing or established by the CHURCH from time to time; and

d)    Will attend all regularly scheduled CHURCH meetings and other official job functions unless illness or emergency makes attendance impossible or impractical.

****

## 11.  Equitable Relief

The parties agree that each of the terms of paragraphs 7 through 11 above is a material term of this Agreement which is intended to be for the Church's benefit and enforceable directly by the Church.  Pastor agrees that in the event of his breach of any of the provisions of paragraphs 7 through 11 above, any remedy at law (including money damages) is insufficient to protect the Church's interests and the Church will be entitled to specific performance hereof or injunctive relief against Pastor, or both, in addition to money damages or other relief to which the Church may be entitled, and Pastor further waives any requirement for the securing or posting of any bond in connection with obtaining such equitable relief.

## 12.  Termination

12.1        Automatic Termination:  This AGREEMENT will automatically terminate, and any further obligations of the parties excused, upon the fling of . . .bankruptcy by or against either party, an assignment for the benefit of creditors by either party, or the appointment of a receiver over the business affairs of either party. . . [and] upon the death of the pastor.

12.2        Termination without Cause:  At any time <u>after March 9, 2013</u> either party may terminate this Agreement upon ninety (90) days written notice without cause.

If this AGREEMENT is terminated by the CHURCH without cause, the pastor shall be entitled to receive the salary and benefits . . . he would otherwise be entitled to receive for the unexpired term of this AGREEMENT . . . , but reduced after five (5) years from the date of Termination by the amount of the Pastor's salary from any other employment for that period.  The payments shall be in full settlement of any claims the pastor may have against the CHURCH.

12.3        Termination for Cause:        This AGREEMENT may be terminated at the option of either party upon thirty (30) days prior written notice by either party of the material breach of the terms of this AGREEMENT by the other party, which breach is not cured within such thirty (30) days.  The rights of termination set forth in this contract are in addition to any other rights of termination allowed to either party by law.  Without limiting other rights or grounds for termination which the CHURCH may have under this Agreement or by law, it is agreed that the CHURCH may terminate this Agreement for cause upon the occurrence of any of the following events:

i.        The pastor commits any serious moral or criminal offense ("serious offense")—including but not limited to adultery, embezzlement, or fraud—is convicted of a felony, or commits any other act which is a violation of applicable law (except for misdemeanors or traffic offenses); or

ii.        The pastor becomes incapacitated by reason of illness, injury or other disability . . . .

12.4        Procedural Requirements:    If this AGREEMENT is proposed to be terminated by the CHURCH for cause as a result of the Pastor committing any

serious offense, the matter must be brought before the CHURCH Deacon Board.  If the Board recommends a termination of this Agreement for cause based on any serious offense, the recommendation must be presented to the congregation of the CHURCH and put to a vote during a special meeting called for that purpose.  In such event, this AGREEMENT may be terminated only upon the approval of the congregation.

The associate pastor or such other person as may be designated by the Deacon Board will chair the congregational meeting, and the order of business at such meeting will be as follows:  1) roll call; 2) presentation of evidence by the personnel Committee chair or its designee; 3) presentation of case by the pastor or his designee; 4) rebuttal evidence presented by the Deacon Board; 5) testimony from members of the congregation; and 6) the matter shall be put to a vote.

**\*\*\*\***

16.    Entire Agreement

This AGREEMENT  contains the entire agreement between Dr. Lee and the Church, and supersedes any and all other agreements, written or oral, express or implied, pertaining to the subject matter hereof.

No supplements, modifications or amendments of this AGREEMENT shall be binding unless executed in writing by the parties.

**\*\*\*\***

18.    General Provisions

The waiver of either of the PARTIES of a breach or violation of any provision of this AGREEMENT shall not operate as or be construed to be a waiver of any subsequent breach hereof.  This AGREEMENT constitutes the product of negotiations of the parties hereto and any enforcement hereof will be interpreted in a neutral manner and not more strongly for [sic] against any party based upon the source of the draftsmanship hereof.  If any provision of this Agreement shall be held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions hereof shall continue to be fully effective.

19.    GOVERNING LAW

This AGREEMENT shall be construed and governed in all respects in accordance with the laws of the Commonwealth of Pennsylvania.

(Docket No. 76-3 at 19-26).

The Employment Agreement was presented to the Church at the Call of the Church

Congregation on April 7, 2013.  (Docket No. 87 at ¶ 25; [Ex. 11 to Defendant's Ex. A, "April 7,

2013 minutes"]). At this meeting, members of the Congregation inquired as to the terms of the Agreement, including the conditions providing for termination. (Docket No. 87 at ¶ 25; April 7, 2013 minutes). The Congregation's approval of the Employment Agreement was based on statements and promises made by Dr. Lee that if he was not performing his job, that would constitute cause for termination under the Agreement." (Docket No. 87 at ¶¶ 7; 26; April 7, 2013 minutes). Specifically, Dr. Lee represented to the Congregation regarding the Employment Agreement they were considering whether to vote to approve that:

> If the church is not going in the direction that we think the church ought to go, if the church declines and the church is just dying, that's cause, because it is my Pastor responsibility and duty to make sure that the church grows and the church becomes better than the way I received it.

(Docket No. 87 at ¶ 27, 28; April 7, 2013 minutes; Rev. Lee Depo at 74) (emphasis added). Rev. Lee further represented to the Congregation that:

> But if just [sic] want to get used to the money and some do, then you have a right, because there is a clause that says that just cause, because the church is not growing, the church is stagnant, the church is not a better place. You have right to call for these Deacons and any member of the church to have me to vacate the pulpit.

(Docket No. 87 at ¶ 29; April 7, 2013 Minutes). Rev. Lee further stated on just cause:

> The clause says, if I don't perform my duties well, I'm out. Help me out, I'm giving you a clause to make sure you'll don't get stuck with somebody you don't want, it's in there.

(Docket No. 87 at ¶ 31; April 7, 2013 Minutes). After initial equivocating in his deposition on September 27, 2016, Rev. Lee ultimately admitted making these statements. (Docket No. 87 at ¶¶ 28, 30, 32).

The resolution approving the Employment Agreement provides that the Congregation resolved to approve it and resolved that the Pastor's duties and responsibilities under it are "subject at all times to the ultimate control and direction of the Church via its congregation."

(Docket No. 76-3, Ex. B at 11 (sections 5 and 6(a)). The resolution approving the Employment Agreement also provides under section 6(c) that the "Church finds its headship under the Lord Jesus Christ and in its Pastor" and under section 6(e) that the "Pastor is the leader of pastoral ministries of the Church. He will work with the Deacons and the Church staff in achieving its mission and proclaiming the Gospel to believers and unbelievers." The Resolution provides under section 2 that the "Deacons shall serve dual status as Deacons and Trustees." Finally, the Resolution provides in section 3 that the "Pastor-elect and Deacon board will draft [a] new constitution and by-laws that will align with God's Word to be presented to the church for review to be approved and adopted by this local body of believers." Ultimately, the Church Congregation approved the Employment Agreement at the Church Call meeting on April 7, 2013. (Docket No. 83 at ¶ 7; Docket No. 87 at ¶ 7).

Subsequently, at a Church meeting on April 28, 2013, Rev. Lee further stated to the Congregation:

> the church has the final say in this way. If I am not doing my job and the church is suffering, the church has every right to make sure it protects the church, because you don't want the church to die. Now if you want to do it in spite of the church doing what church is doing and we are doing well, no you can't, that where the employment clause came in without cause.

(Docket No. 87 at ¶ 33; [Exhibit 13 to Defendant's Ex. A, "April 28, 2013 Minutes"]).

In the governing structure of the Church, the Deacons are responsible for the spiritual well-being of the Church and the Trustees are responsible for its financial well-being. (Docket No. 87 at ¶ 39). On or about March, 2014, the second year of Rev. Lee's tenure as Pastor, a joined Board of Deacons and Trustees began to make serious inquiry about four things with respect to Lee's leadership of the Church. (Docket No. 87 at ¶ 38; Taylor Depo. at 5-6). The level of giving to the Church in terms of tithes, offerings, and donations diminished appreciably

from the point of Rev. Lee's initial tenure in December of 2012 to that of 2014. (Docket No. 87 at ¶ 40; Taylor Depo. at 6). For example, from November of 2013 to November of 2014 tithes and offerings diminished 39% and attendance at morning worship dropped 32% (Docket No. 87 at ¶¶ 41, 42; Def. Ex. C; Taylor Depo. at 6). From January 2013 through December 2014, there was a 61% decrease in registered members of the Church. (Docket No. 87 at ¶ 43; Def. Ex. C; Taylor Depo. at 14-15 and Ex. E, App'x. Ex. C). Rev. Lee had decided but failed to follow through with taking over training the deacons. (Docket No. 87 at ¶ 44). Church expenditures nearly doubled from 2013 to 2014 and Church expenditures were exceeding Church receipts, rapidly eroding the Church's credit base. (Docket No. 87 at ¶ 45; Taylor Deposition at 74-75).

From the first year of Rev. Lee's tenure to the second year, the quality of the Church's community outreach and ministries declined. (Docket No. 87 at ¶ 46; Taylor Deposition at 74). The Church's hallmark program of service to the community is its SEED program. (Docket No. 87 at ¶ 47; Taylor Deposition at 75-78). Funds from the SEED program were diverted to pay for necessary Church expenditures as opposed to furthering the SEED ministry. (Docket No. 87 at ¶ 47; Taylor Deposition at 75-78). Although Rev. Lee set a number of meetings of the Church membership between June and December, 2014 for the purpose of discussing financial and ministerial issues, he cancelled all of them. (Docket No. 87 at ¶ 48; Taylor Deposition at 84-86). Financial contributions, the Church's registered membership, and worship attendance all declined during Rev. Lee's tenure. (Docket No. 87 at ¶ 49; Lee Depo at 134, 136, App. Ex. A; Taylor Deposition at 84-86).

On or about December 21, 2014, the Church organized a meeting of the Congregation at which it was recommended that the Congregation vote to have Rev. Lee vacate the pulpit immediately, void the Pastor's employment contact, and approve suggested severance terms.

(Docket No. 83 at ¶ 16; Docket No. 87 at ¶ 16; Plaintiff's Ex. E at 2). The following reasons were presented in support of the recommendation: failures in financial stewardship, failures in spiritual stewardship, and failures to respond to church leaders. (Docket No. 83 at ¶ 17; Docket No. 87 at ¶ 17; Plaintiff's Exhibit E at 2). Regarding asserted failures in spiritual stewardship, the written recommendations list under "Findings B:"

the "DIMINISHED CAPACITY TO FULFILL THE GREAT MISSION, Matt 28:19-20:

- to attract new souls to Christ,
- to cultivate new ambassadors for Christ, and
- to transform families, neighborhoods, and the city for Christ.

(Docket No. 76-4 at 9). The written recommendations also profile "New MEMBERS JOINING AND RECEIVING THE RIGHT HAND OF FELLOWSHIP." (Docket No. 76-4 at 10). The written recommendations further contain:

REFLECTIONS ON OUR CAPACITY TO FULFILL THE GREAT MISSION, Matt. 28: 19-20:

- **to attract new souls to Christ:** . . . <u>We would characterize this as a dramatic decline in attracting new souls for Christ.</u>
- **to cultivate new ambassadors for Christ:** . . . <u>Our overall judgment is that our capacity to cultivate new ambassadors for Christ has grown progressively more negative than positive over the two years of Pastor Lee's leadership.</u>
- **to transform families, neighborhoods, and the city for Christ.** . . . <u>We conclude Pastor Lee has failed during both years to launch and sustain ministries that help to transform local and public places where our children and families live.</u>

Our prediction for the future under Pastor Lee's leadership is summarized in the following graph: [depicting failing spiritual stewardship leading to failing financial stewardship and the Church in continual decline, resulting in a diminished capacity "to Fulfill the Great Commission."].

(Docket No. 76-4 at 13). The document then addresses "Findings C: Pastor's Failure to Provide Vital Information Requested by Church Leaders." (Docket No. 76-4 at 13). The document concludes with recommendations by the Board of Deacons and the Board of Trustees that Rev.

Lee vacate the pulpit immediately, and that the Church void the pastor's employment contract further based on the "'Voice of Precedence,' 'The Voice of Sovereignty:' The church under Baptist polity is sovereign and the church has the final word by vote on the matter, and the 'Voice of the Pastor' wherein he stated to the congregation that "if the church declines and the church is not going in the direction that we think the church ought to go, if the church declines and the church is just dying, that's a cause [for breaking the contract]. . . . even in Pastor Lee's own words." (Docket No. 76-4 at 16).

Three weeks later, a second meeting of the Congregation was convened at which time it was recommended that the Congregation vote to have Rev. Lee vacate the pulpit immediately, void the Pastor's employment contact, and approve suggested severance terms. (Docket No. 83 at ¶ 16; Docket No. 87 at ¶ 16; Plaintiff's Ex. E at 2). The following reasons again were presented in support of the recommendation: failures in financial stewardship, failures in spiritual stewardship, and failures to respond to church leaders.[6] (Docket No. 83 at ¶ 17; Docket No. 87 at ¶ 17; Plaintiff's Exhibit E at 2). The Church voted affirmatively for Lee to vacate the pulpit immediately, to void the Pastor's employment contract, and to approve suggested severance terms on the basis of Lee's failures in financial stewardship, failures in spiritual stewardship, and failures to respond to church leaders. (Docket No. 83 at ¶ 19; Docket No. 87 at ¶ 19; Plaintiff's Exhibit F [Jerome Taylor Deposition] at 88-89). Accordingly, on January 11, 2015, the Church terminated Lee's employment as Pastor of the Church. (Docket No. 83 at ¶ 20; Docket No. 87 at ¶ 20; Plaintiff's Exhibit E at 2).

---

[6] Rev. Lee apparently contends in a parenthetical in his Concise Statement of Facts, without evidence, and the Church disputes it, that the asserted failure to respond to Church leaders was only a delay in providing information to the Board it already had access to or did not request. (Docket No. 83 at ¶¶ 17, 18; Docket No. 87 at ¶¶ 17, 18; Plaintiff's Ex. E at 2). Rev. Lee, however, does not develop any argument regarding same in his brief. Moreover, viewing the evidence in the light most favorable to the Church, the non-moving party, this assertion does not meet his burden to show that he did not fail to respond to Church leaders, as contended.

The Employment Agreement provides that its initial term would commence on December 1, 2012, and would expire on December 31, 2032. ((Docket No. 83 at ¶ 8; Docket No. 87 at ¶ 8). Docket No. 1 at ¶¶ 21, 31, Ex. B at § 3, p. 2; Ex. D to Motion at 3.1). Nevertheless, it also provides that the Church, adhering to certain procedures and substantive requirements, may terminate the Plaintiff with cause and without cause. (Docket No. 83 at ¶ 9; Docket No. 87 at ¶ 9; Exhibit D at 12.2 and 12.3).

Section 12 of the Contract states various terms and conditions governing termination of the Pastor's employment, (Docket No.1 at ¶¶ 22, 23, 29, 30, Ex. B at §12, p. 5-7), including that either party could terminate the agreement with or without cause but with certain contractual consequences. (Docket No. 1, Ex. B at §§ 12.2 & 12.3). (Docket No. 83 at ¶ 9; Docket No. 87 at ¶ 9).

This Court observed in its opinion granting judgment on the pleadings to the individual defendants:

> The Contract further provides that "[t]he rights of termination set forth in this contract are in addition to any other rights of termination allowed to either party by law." (Docket No. 1, Ex. B at § 12.3). Lee's Complaint alleges that termination of his employment as Pastor of the Church was without cause as cause is defined more fully in the Contract. (Docket No. 1 at ¶ 37, and Ex. B, § 12.3 (i) & (ii)). Lee filed a single count action for breach of contract against all defendants, seeking payment of $2,643,996.40, plus costs of suit and attorney's fees under the Contract.

(Docket No. 1 at 11). The Church defended the breach of contract claim by asserting that Lee was terminated for cause and numerous other defenses to his claim. (Docket No. 71).

III.    PROCEDURAL HISTORY

On September 9, 2015, Rev. Lee commenced this diversity action in the United States District Court for the Eastern District of Pennsylvania. (Docket No. 1). All defendants moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue. (Docket No.

2).  In opposition to the motion, Rev. Lee requested that the District Court pursuant to 28 U.S.C. § 1406 transfer the action to the Western District of Pennsylvania because the individual defendants all reside within the Western District and because the corporate defendant, the Church, has its principal place of business in the Western District.  (Docket Nos. 3 at 2 ¶¶ 2, 3, 5; 2 at ¶¶ 2, 3). The Court determined that transfer to this district would further the interests of justice, ruling that "all twelve Defendants are residents of the Western District of Pennsylvania, and the events underlying the cause of action occurred within that district.  Transfer rather than dismissal would further the interest of justice." (Docket No. 4 at 3).  Defendants filed their answer in the Eastern District on December 3, 2015. (Docket No. 18).

Three months later, the matter was transferred to this Court.  (Docket No. 20).  This Court held a case management conference on January 12, 2016, (Docket No. 36), and referred the matter to mediation.  (Docket No. 38).  On February 12, 2016, Lee filed a Motion for Partial Summary Judgment, which the Court denied as premature that same day.  (Docket Nos. 40, 41). Mediation was held on February 24, 2016, but the matter did not settle.  (Docket No. 42). Thereafter, the individual defendants on February 26, 2016 filed a Motion for Judgment on the Pleadings, (Docket No. 43), Rev. Lee filed his Response to the Motion on March 28, 2016, (Docket No. 47), the individual defendants filed their Reply on April 11, 2016, (Docket No. 51), and Rev. Lee filed his Sur-Reply on April 25, 2016.  (Docket No. 53).  The Court granted the Motion in accordance with its May 4, 2016 Memorandum Opinion.  (Docket Nos. 54, 55).  Due to discovery delays resulting from a change in Plaintiff's counsel, the Church requested and the Court granted a two month extension of the May 31, 2016 deadline until July 31, 2016 to amend the pleadings.  (Docket Nos. 59, 60).  Subsequently on September 30, 2016, the Church filed a motion to extend the discovery deadline to December 1, 2016, (Docket No. 64), which was

contested, (Docket Nos. 65, 67), and which the Court granted by Order dated October 4, 2016, after oral argument held on the motion that same date. (Docket Nos. 68, 69). On September 30, 2016, the Church also requested leave to file an Amended Answer, which was uncontested as a result of the Court's extension of the discovery deadline and which the Court likewise granted on October 4, 2016. (Docket No. 70). The Church filed its Amended Answer on October 13, 2016. (Docket No. 71).

On January 31, 2017, Rev. Lee filed an affirmative motion for summary judgment on his sole claim for breach of contract, (Docket No. 76), with Brief in Support (Docket No. 77), and Concise Statement of Material Facts. (Docket No. 78). Plaintiff subsequently filed an Amended Brief in Support (Docket No. 82), and an Amended Concise Statement of Material Facts (Docket No. 83) on February 2, 2017.[7] The Church filed its Brief in Opposition to Motion for Summary Judgment on March 2, 2017, (Docket No. 86), with its Responsive Concise Statement of Material Facts, (Docket No. 87), and Appendix in Support. (Docket No. 88). The Court originally scheduled argument on the motion for summary judgment for April 7, 2017. (Docket No. 75).

After further review of the matter and the parties' filings, the Court became skeptical that this matter ultimately could go forward under First Amendment Free Exercise and Establishment Clause jurisprudence. Accordingly, the Court entered an order on April 5, 2017 rescheduling argument for May 12, 2017, giving notice pursuant to Federal Rule of Civil Procedure 56(f), and requiring the parties to address through additional briefing the following:

> whether and to what extent the ministerial exception under the First Amendment's Free Exercise Clause and excessive entanglement under the First Amendment's Establishment Clause, *see, e.g., Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C*, 565 U.S. 171 (2012), *Petruska v. Gannon Univ.*, 462 F.3d 294

---

[7] Rev. Lee made these amended filings on February 2, 2017, two days after the deadline for filing for summary judgment and without requesting leave.

(3d Cir. 2006), and related Pennsylvania law, affects further adjudication of this matter. *See also* Rule 56(f). The parties also shall address in the briefing whether the language in the agreement at § 12.3 governing termination for cause encompasses the ministerial exception.

(Docket No. 89). Rev. Lee filed his supplemental brief on April 21, 2017, (Docket No. 91), as did the Church. (Docket No. 90). The parties were afforded the opportunity to file responsive briefs to the opposing party's supplemental brief, (Docket No. 89), but neither chose to do so. Hearing on the matter was held on May 12, 2017, (Docket No. 92), with the transcript of same filed on August 11, 2017, (Docket No. 93), and this matter is fully ripe for disposition.

IV.    LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). A grant of summary judgment under Federal Rule of Civil Procedure 56(a) is appropriate when the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). A genuine issue of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 247-48. As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. North*

*Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine issues. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the moving party satisfies its burden, the non-moving party then must present sufficient evidence of a genuine issue, in rebuttal. *Santini v. Fuentes,* 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587)). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to the non-moving party when there is a conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F.App'x 139, 141 n. 4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F. 3d 195, 200 (3d Cir. 1995)). The court's function on summary judgment is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility, rather the court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005); *Simpson v. Kay Jewelers,* 142 F.3d 639, 643 n. 3 (3d Cir.1998) (quoting *Fuentes v. Perski*, 32 F.3d 759, 762 n. 1 (3d Cir. 1994)). The Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. A well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev.*

*Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)).

Ordinarily, the non-moving party must rely on affidavits, depositions, admissions, and/or interrogatories to demonstrate the existence of a genuine issue. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324). Where the moving party is the party bearing the burden of proof, "the standard is more stringent." *National State Bank v. Federal Reserve Bank*, 979 F.2d 1579, 1582 (3d Cir. 1992). Rev. Lee as Plaintiff:

> [b]ears the burden of proof on [his breach of contract claim]. "After all, the burden of proof includes the obligation to persuade the factfinder that one's propositions of fact are indeed true. Thus, if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will."

*Wallace v. Nat'l Indem. of Mid-Am.*, 2:14-cv-1253, 2016 WL 6948781, at *3 n. 2 (W.D. Pa. July 8, 2016) (quoting *El v. Se. Pennsylvania Transp. Auth. (SEPTA),* 479 F.3d 232, 238 (3d Cir. 2007)). In this posture, "where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment *even if no opposing evidentiary matter is presented*." *Federal Reserve Bank*, 979 F.2d at 1582 (emphasis added) (citing *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992)).

## V. DISCUSSION

Rev. Lee contends that he is entitled to summary judgment in his favor asserting:

- He had a valid and enforceable contract with Defendant;[8]

---

[8] As the Court granted judgment on the pleadings to the individual defendants and the Church is the only defendant remaining, Rev. Lee erroneously refers to "Defendants" in his brief.

- Defendant breached that contract by not compensating him under the termination without cause clause of the contract; and
- Defendant's breach caused him harm because he was ousted from his position as Pastor and was denied compensation after January 15, 2015.

(Docket No. 82 at 6). In summary fashion, Rev. Lee states that the Church cannot produce evidence that it did not breach the contract and can provide no evidence to support its affirmative defenses. (*Id.* at 5). Rev. Lee, however, does not attempt to make <u>any</u> showing as to an absence of genuine issue of fact on the defenses asserted by the Church as he utterly fails to address them.

Rev. Lee's brief outlines the basic requirements for a breach of contract action. (Id. at 6). "Under Pennsylvania law, an action for breach of contract has three elements: 1) the existence of a contract, including its essential terms; 2) a breach of a duty imposed by the contract; and 3) resulting damages." *Rendon v. Ragans*, No. CIV. A. 08-1665, 2009 WL 1514471, at *2 (W.D. Pa. May 29, 2009). Rev. Lee also generally describes required matters for formation of a contract, including that that the parties came to agreement as to the required definite terms and the parties executed the agreement with required approval by the Church Congregation. (Docket No. 82 at 6-7). "The elemental aspects necessary to give rise to an enforceable contract are 'offer', 'acceptance', 'consideration' or 'mutual meeting of the minds.'" *Schreiber v. Olan Mills*, 627 A.2d 806, 808 (Pa. Super. Ct. 1993).

> Under ordinary contract law, contracts are enforceable when parties reach mutual agreement, exchange consideration and have set forth terms of their bargain with sufficient clarity. Additionally, an agreement is definite if it indicates that parties intended to make a contract and if there is an appropriate basis upon which a court can fashion a remedy. Moreover, when the language of the contract is clear and unequivocal, courts interpret the meaning by its content.

*J.W.S. Delavau, Inc. v. E. Am. Transp. & Warehousing, Inc.,* 810 A.2d 672, 681 (Pa. Super. Ct. 2002) (internal citations omitted). Rev. Lee does not address the defenses asserted by the Church directed at contract formation, such as that the incorporating documents vested power in the Board of Trustees, as opposed to Board of Deacons, that there was fraud in the inducement and execution, and asserting there was an amendment to the Employment Agreement by the subsequently promulgated By-Laws shepherded by Rev. Lee. *See, e.g.* (Docket No. 71, ¶¶ 53-55). The only bases for termination for cause under the Employment Agreement that Rev. Lee acknowledges are the specific bases articulated in § 12.3(i) & (ii). (Tr. 5/12/17 at 17, 20).

Rev. Lee's motion boils down to the argument that he was fired without cause and that under Agreement § 12.2 he is entitled to certain payments for a termination without cause. Tellingly, and in order to avoid the effect of certain relevant language in the contract, Rev. Lee cites in his motion, brief and concise statement of facts only excerpted provisions of the termination with cause section of the contract, but providing them as if they were in one contiguous section and omitting the following highlighted portions:

> 12.3 ***Termination for Cause:*** This AGREEMENT may be terminated at the option of either party upon thirty (30) days prior written notice by either party of the material breach of the terms of this AGREEMENT by the other party, ***which breach is not cured within such thirty (30) days. The rights of termination set forth in this contract are in addition to any other rights of termination allowed to either party by law. Without limiting other rights or ground for termination which the CHURCH may have under this Agreement or by law,*** it is agreed that the CHURCH may terminate this Agreement for cause upon the occurrence of any of the following events:
>
> > i. The pastor commits any serious moral or criminal offense ("serious offense")—including but not limited to adultery, embezzlement, or fraud—is convicted of a felony, or commits any other act which is a violation of applicable law (except for misdemeanors or traffic offenses); or
> >
> > ii. The pastor becomes incapacitated by reason of illness, injury or other disability . . . .

*Compare* (Docket No. 76-3) (emphasis added) *with* (Docket No. 83 at ¶ 13).

Rev. Lee admits in his brief that the agreement clearly and categorically outlines his duties and responsibilities, (Docket No. 82 at 8), but nevertheless ignores the Church's assertion of material breach of his duties as a basis for termination.  Not only are there governing principles of Pennsylvania law regarding material breach, discussed *infra* and ignored by Rev. Lee, but § 12.3 on Termination for Cause specifically lists material breach as a basis to terminate for cause, likewise ignored by Rev. Lee.

Rev. Lee's position that an award to him by this Court is simply a rote matter, not involving cause and not implicating any ecclesiastical concern ultimately is untenable.  The Church might have had the right to terminate without cause with the certain consequences of § 12.2 resulting, but the specific inclusions of other grounds for termination employed in § 12.3 decidedly connote them as termination for cause.  Indeed, the plain meaning of cause is "(2.) reason or motive for some human action. (3.) good or sufficient reason: . . . to be dismissed for cause."  Random House Dictionary of the English Language, p. 330 (2d. Ed. 1987) (unabridged). Under Rev. Lee's approach, several clauses in the governing provision on termination with cause essentially are stricken from the contract and the term "only" grafted onto the contract by him to then provide in §12.3 that "the Church may *only* terminate this Employment Agreement for cause upon the occurrence of any of the following events."  That is the exclusive way that a serious offense or incapacitation becomes the only bases for a termination for cause under the express terms of the contract, readily entitling him to recovery on the liquidated damages clause in § 12.2, (Docket No. 82 at 8-9), absent other applicable defenses.  The parties could have but did not choose to include the term "only" in § 12.3.

Expectedly, the Church argues in response to Rev. Lee's motion that he nowhere addresses the defenses asserted by the Church to the breach of contract claim, including, *inter*

*alia*, the asserted material breach by Rev. Lee of the Employment Agreement, as well as the contention by the Church that a subsequent agreement modified the terms of the Employment Agreement. (Docket No. 86 at 2). The Church has contended *ab initio* that Rev. Lee's failure in fulfilling his duties and responsibilities outlined in the Employment Agreement resulted in his eventual termination. The documents provided by both parties on the present motion and previous matters make that eminently clear. *See*, *e.g.* (Docket No. 1, Ex. C). Inexplicably, Rev. Lee does not address this argument in his moving papers—other than to posit that a firing for other than a serious offense or incapacity entitles him to the liquidated damages provided under termination without cause. This stance, however, is woefully inadequate to show, as he is required on summary judgment, the absence of a genuine issue of fact, much less meet the more exacting standard for a moving party bearing the burden of proof.

Under Rule 56(a), Rev. Lee might have sought summary judgment on the defenses indicated by the Church, that he had notice of in the filing of the Answer, the Amended Answer, as well as in multiple other filings by the parties. *See e.g.*, (Docket No. 1, Complaint Ex. A [Church Charter of Incorporation vesting authority in Board of Trustees only]; Docket No. 43 at 2, Motion for Judgment on the Pleadings [pointing to By-Laws giving the Congregation the right to remove the Pastor by a two thirds vote constituting a right of termination under law under § 12.3]; Docket No. 67 [reply in support of discovery extension]; Docket No. 68 [10/04/16 Minute Entry indicating good cause shown for discovery extension]; Docket No. 71 (Amended Answer) at ¶¶ 18, 19, 24, 27, 40, 42, 50, 51, 53, 54, 55, 57, 58, 59 [indicating termination was for cause; the Plaintiff exerted improper and undue influence; the Plaintiff was in breach of the agreement and given notice and opportunity to cure; the By-laws adopted on proposal of and agreed to by the Plaintiff superseded the Agreement and were a subsequent agreement; failure to exhaust

internal ecclesiastical remedies; after acquired evidence; unconscionability; adhesion; the execution of the Employment Agreement on March 20, 2013 was without legal authority; fraud in the inducement and execution; misrepresentation; and failure to meet Church goals]). Instead, Rev. Lee declined to address the Church's defenses to the contract action, providing nothing more than a simple passing reference without further description, discussion or consideration. *See, e.g.* (Tr. 5/12/17 at 5). To obtain summary judgment on affirmative defenses, a plaintiff must show as to them the absence of a genuine issue of material fact. *Energy Intelligence Group, Inc. v. United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Serv. Workers Int'l Union, AFL-CIO/CLC*, Civ. Act. No. 11-00428, 2013 WL 4648333, at *1, (W.D. Pa. Aug. 29, 2013); Rule 56(a). Here, however, Rev. Lee ignores quite frankly all defenses raised by the Church in its prior filings. Even if the Court were to accept his urged interpretation of § 12.3, Rev. Lee, in focusing on a single issue—that he was not terminated for a serious offense or incapacity (never asserted by the Church)—has failed to show entitlement to summary judgment in his favor on his breach of contract claim. By his decided approach, then, Rev. Lee has failed to assuage the Court that there is the absence of genuine issues of material fact. Thus, the motion will be denied.

Although the Court concludes that Rev. Lee's present motion for summary judgment must be denied, the Court's task at hand is not complete. The Court next faces whether it should dismiss this contract action due to First Amendment free exercise and establishment concerns. To this end, the Court must address certain contractual concepts as foundation for that inquiry. These considerations not only reinforce the Court's determination that Rev. Lee's motion for summary judgment must be denied but also lay the groundwork for the Court's ultimate determination that this matter cannot proceed in court consistent with the First Amendment.

## A.    Material Breach

The Church argues that it has asserted a material breach providing for termination of Rev. Lee's employment for cause and further that Rev. Lee represented to the Congregation as part of its decision-making process to approve the Employment Agreement that his failure to meet Church goals would constitute a material breach and be cause for termination. (Docket No. 86 at 10). Incredulously, and despite specific provision in § 12.3 and under Pennsylvania law, Rev. Lee steadfastly maintains that a material breach of the Employment Agreement by him would still entitle him to liquidated damages under §12.2's provisions governing terminations without cause. (Tr. 5/12/17 at 12, 16, 17).

The "general rule [is] that a "material breach" relieves the non-breaching party of its duty of performance. *Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1270 (Pas. Super. Ct. 2012). Additionally, though not necessary given general contract principles on material breach, § 12.3 specifies as cause a material breach by either party.

As the Church points out, "[s]tate law determines whether breach of a contract provision is material," *In re Gen. DataComm Indus., Inc.,* 407 F.3d 616, 627 (3d Cir. 2005), and materiality of the breach is generally a question for the fact-finder, *Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.,* 40 A.3d 1261, 1272 (Pa. Super. Ct. 2012) ("We emphasize that we and other courts consistently have treated inquiries into the materiality of a given breach as fact questions rather than questions of law to be decided from the bench."); *Paramount Fin. Commc'ns, Inc. v. Broadridge Inv'r Commc'n Sols., Inc.,* No. CV 15-405, 2017 WL 495784, at *6 (E.D. Pa. Feb. 7, 2017) ("[M]ateriality of a breach is generally an issue of fact to be decided by a jury.") (internal citations and quotations omitted), though there are instances where materiality may be determined as a matter of law.

Courts, may determine materiality as a matter of law:

> if the materiality question in a given case admits of only one reasonable answer (because the evidence ... is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a question of law. Thus, in certain situations, Pennsylvania courts and the Third Circuit have concluded that it can be appropriate to answer the materiality inquiry as a matter of law. . . . Pennsylvania courts utilize a five factor materiality analysis outlined in Restatement (Second) of Contracts § 241 to determine whether a breach is "simple" or "material."

*Paramount Fin. Commc'ns, Inc.*, No. CV 15-405, 2017 WL 495784, at *6 (internal citations and quotations omitted). The Church's acknowledgement that the matter of material breach is usually reserved for the jury, explains, at least in part, why the Church did not itself move for summary judgment on the breach of contract claim.

Contrary to Rev. Lee's position, material breach of a contract can constitute cause, even in a case where it is not expressly listed as cause in the contract.[9] In *Ott v. Buehler Lumber Co.*, 541 A.2d 1143, 1144 (Pas. Super. Ct. 1988), the Pennsylvania Superior Court addressed the employee's failure to perform duties outlined in his contract, reversing the trial court in its instruction to the jury. The court explained:

> When a formal written contract of employment has been entered into, courts historically have accepted the position that discharge of the employee before the end of the contract can give rise to liability under ordinary breach of contract principles. The general rule is that a party who has materially breached a contract may not complain if the other party refuses to perform his obligations under the contract. A party also may not insist upon performance of the contract when he himself is guilty of a material breach of the contract. Moreover, where the evidence to sustain the justification for discharge is disputed, the jury must pass on it. As such, the instruction for the jury should have simply focused upon whether Appellee's conduct amounted to a material breach of the employment agreement.

*Ott,* 541 A.2d at 1145 (internal quotations and citations omitted).

---

[9] Rev. Lee's position on materiality does not square with the Agreement or the law on material breach. No matter how dedicated Rev. Lee is to salvation from it, the language of § 12.3 also expressly provides for termination for a material breach.

> In contract actions, if one party commits a material breach, the other party may generally use it to justify nonperformance even if, at the time of its own nonperformance, the second party was unaware of the first party's material breach. *See College Point Boat Corp. v. United States,* 267 U.S. 12, 15–16, 45 S.Ct. 199, 200–01, 69 L.Ed. 490 (1925); Rest.2d Contracts § 385 cmt. *a* (1981); *id.* § 225 & cmt. *e; id.* § 237 & cmt. *c; cf. id.* § 164 (fraudulent inducement makes a contract voidable).

*Mardell v. Harleysville Life Ins. Co.,* 31 F.3d 1221, 1240 (3d Cir. 1994) (emphasis added), *cert. granted, judgment vacated,* 514 U.S. 1034, 115 S. Ct. 1397, 131 L. Ed. 2d 286 (1995), and *opinion vacated in part,* 65 F.3d 1072 (3d Cir. 1995), *abrogated on other grounds by McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S. Ct. 879, 130 L. Ed. 2d 852 (1995).

Agreement § 12.3 provides for a thirty day cure, which is perhaps why the Congregation approved continued salary for thirty days after its decision that Rev. Lee was to vacate the pulpit. Yet, where the contract provides for a cure period, a unilateral termination of the agreement without opportunity to cure still may be justified. *Alderson v. Keeney,* No. 1703 MDA 2012, 2013 WL 11251548, at *6 (Pa. Super. Ct. Oct. 18, 2013), provides:

> [The Pennsylvania] Supreme Court determined that the existence of a contractual provision providing a breaching party ninety days to cure its default before termination of the agreement was not conclusive of whether [the defendant] could terminate the agreement unilaterally under the circumstances presented. It noted familiar Pennsylvania principles that "a material breach of a contract relieves the non-breaching party from any continuing duty of performance thereunder," and that a party may not insist upon performance of the contract when he himself is guilty of a material breach of the contract. It then turned to other jurisdictions' case law to consider these principles in the context of agreements of similar character. After lengthy review, the Court held that even a clear notice and cure requirement in a contract will not preclude immediate termination of a contract when there is a breach of contract going directly to the essence of the contract, which is so exceedingly grave as to irreparably damage the trust between the contracting parties.

*Alderson,* 2013 WL 11251548, at *6 (internal citations and quotations omitted),

> Returning to core principles, Pennsylvania courts consistently have viewed questions of materiality to be questions of fact to be decided by a jury. *Int'l Diamond Importers, Ltd., v. Singularity Clark, L.P.,* 40 A.3d 1261, 1272 (Pa.Super.2012). Similarly, we have held that "[w]hether a breach is so

substantial as to justify an injured party's regarding the whole transaction as at an end is a question of degree; and it must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case." *Widmer Eng., Inc., v. Dufalla,* 837 A.2d 459, 468 (Pa.Super.2003) (internal quotation marks omitted).

*Alderson v. Keeney*, No. 1703 MDA 2012, 2013 WL 11251548, at *7–8 (Pa. Super. Ct. Oct. 18, 2013); *see also LJL Transp., Inc. v. Pilot Air Freight Corp.,* 962 A.2d 639, 652 (2009) (in cases where the breach goes to the essence of the contract requiring notice before termination would be useless).

"Materiality goes to the essence of the contract; a breach is material if it 'will deprive the injured party of the benefit that is justifiably expected' under the contract." *Gen. Motors Corp. v. New A.C. Chevrolet, Inc*., 263 F.3d 296, 315 (3d Cir. 2001) (citing 2 E. Allan Farnsworth, Farnsworth on Contracts § 8.16, at 497 (2d ed.1998)). The Pennsylvania Superior Court in *Int'l Diamond Importers, Ltd.,* additionally instructed on material breach:

we focus on Pennsylvania's extensive body of caselaw addressing when a breach is sufficiently material to entitle the non-breaching party to cease performance. . While a "material breach" relieves a non-breaching party of its obligation to perform, our law also is clear that executed contracts cannot be rescinded or annulled ... simply because a party found the contract to be burdensome or a financial failure. Thus, if the breach is an immaterial failure of performance, and the contract was substantially performed, the contract remains effective.... In other words, the non-breaching party does not have a right to suspend performance if the breach is not material. Because of the importance of the latter principle, establishing "materiality" requires a substantial showing. To determine materiality, Pennsylvania courts refer to the Restatement (Second) of Contracts § 241 (1981), which sets forth the following factors to guide the inquiry:

a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
b) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;
c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

> d) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;
> e) the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.
>
> Similarly, we have held: Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end is a question of degree; and must be answered by weighing the consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.

*Int'l Diamond Importers, Ltd.,* 40 A.3d at 1270–71 (internal citations and quotations omitted).

In his filings, Rev. Lee did not present any argument on the material breach of the Employment Agreement asserted by the Church, much less any argument that the reasons given do not constitute material breach under the contract or law. At the hearing on the motion, Rev. Lee argued that even accepting material breach he somehow would be entitled to liquidated damages for termination without cause. (Tr. 5/12/17 at 16, 17). Rev. Lee's position wholly ignores that a material breach by him excuses performance by the Church under the contract--- including that the Church would be excused from the obligations under § 12.2, the payment obligations of which he seeks to enforce. By not discussing it then, Rev. Lee has wasted the opportunity to show the absence of a genuine issue of fact, thus preventing summary judgment in his favor.

<strong>B. Consideration of § 12.3 clauses:</strong>

**"Rights of termination allowed to either party by law" and "Without limiting other rights or grounds for termination which the Church may have under this Agreement or by law" ("allowed by law" provisions and "other grounds" provisions)**

By the express terms of the Employment Agreement, material breach constitutes a right or ground "under this Agreement" as it is a specific basis for cause listed in § 12.3 and "by law" as recognized in the caselaw establishing material breach as a basis for non-performance by the

other party.  "Pennsylvania follows the plain meaning rule of contract interpretation, such that [w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed." *Sloan & Co. v. Liberty Mut. Ins. Co.,* 653 F.3d 175, 180 (3d Cir. 2011) (internal citations and quotations omitted); *Capek v. Devito,* 767 A.2d 1047, 1050 (Pa. 2001) ("[W]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone.") (internal citations and quotations omitted).

At the outset, it is observed that neither party asserts ambiguity of the contract—and it specifically is not raised by Rev. Lee, having chosen to ignore entirely the language providing reasons beyond § 12.3(i) and (ii) for his termination by the Church. "Whether a contract is ambiguous is a question of law to be decided by the court."  *Mack Trucks Inc. v. BorgWarner Turbo Sys., Inc.*, 508 F. App'x 180, 183–84 (3d Cir. 2012); *IBEW Local Union No. 102 v. Star-Lo Elec., Inc.,* 444 F. App'x 603, 607 (3d Cir. 2011) (pure question of law.).  The reasons that would support a termination for cause in addition to a "serious offense" or incapacity—those being rights allowed "by law" and rights or "other grounds" for termination under the Agreement—appear quite broad. That contractual language would impart a broad meaning does not render it ambiguous. *See United States v. Yusuf,* 199 F. App'x 127, 130–31 (3d Cir. 2006) (finding broad provision not ambiguous just because terms are broad and not qualified).

For example, this Court recently observed in *714 Ventures, Inc. v. Nat'l Oilwell Varco, L.P.,* 2016 WL 5919934, at *6 (W.D. Pa. Oct. 11, 2016), in the context of a settlement and release agreement that a release provision may or may not have language broad in meaning.

> Under Pennsylvania law, a release is a contract and release provisions are therefore construed according to the usual rules of contract construction. [T]he effect of a release is to be determined by the ordinary meaning of its language. If the language of the release is clear, the court looks no further, <u>even if the</u>

language is broad or general and no matter how "improvident" the agreement may later prove to be for one of the parties. In determining the parties' intent, the language of the release must be viewed in the context of the entire document. Each part of the release must be given effect and clauses should be construed as consistent with one another if possible. If a release is not clear on its face, a court must inquire into the circumstances surrounding its execution in order to discern the intent of the parties and identify those matters which may be fairly said to have been within the contemplation of the parties when the release was given.

*Langenberg v. Warren Gen. Hosp.*, No. 1:12-CV-175-NBF, 2013 WL 6147576, at *14 (W.D. Pa. Nov. 22, 2013) (emphasis added) (internal citations and quotations omitted).

Applying Pennsylvania contract principles, this Court also recently stated in *Kitt v. City of Pittsburgh*, No. CV 15-225, 2016 WL 640534, at *4 (W.D. Pa. Feb. 18, 2016):

The parties do not dispute that the Release is to be assessed by reference to Pennsylvania law. Therefore, the Court will apply basic contract principles to the evaluation of the parties' agreement. *McGowan Investors LP v. Frucher*, 392 Fed. Appx. 39, 45 (3d Cir. 2010). According to those principles, in the absence of a situation such as ambiguity, fraud, or mistake, the Court is bound to examine the plain language of the settlement and release at issue. *Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*, 27 Fed. Appx. 94, 99, 100 (3d Cir. 2002); *Republic Ins. Co. v. Paul Davis Sys.*, 543 Pa. 186, 189 (Pa. 1995); *Bernsten v. Bain*, 2009 Phila. Ct. Com. Pl. LEXIS 89, at *6, 2009 WL 1725944 (Pa. C.P. 2009). "The intent of the parties must be sought from a reading of the entire instrument, as well as from the surrounding conditions and circumstances." *Vaughn v. Didizian*, 648 A.2d 38, 40 (Pa. Super. Ct. 1994). Extrinsic and parol evidence, however, cannot be used to create an ambiguity in a written agreement that is clear, complete, and unambiguous. *Mosaid Techs. Inc. v. LSI Corp.*, 2015 U.S. App. LEXIS 18912, at *15, 2015 WL 6576304 (3d Cir. Oct. 30, 2015). Moreover, it is an important principle of contract law that the court is to give effect to all the language of a contract, whenever possible. *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 326 (3d Cir. 2005); *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 366 (E.D. Pa. 2014).
***
As a threshold matter, therefore, the Court considers whether the Release language is plain and unambiguous. "Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). A court will "not...distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Id.* Moreover, extrinsic evidence may not be used to create an ambiguity where none exists on the face of the agreement. *See IBEW Local Union No. 102 v. Star-Lo Elec., Inc.*, 444 Fed. Appx. 603 (3d Cir. 2011).

Here, as the parties have acknowledged, the language . . . is plain and unambiguous. Plaintiff — as well as most of the case law to which she cites, and the pertinent discussion at oral argument on September 15, 2015 — focuses on the Release's language releasing claims arising out of, or connected with, the subject matter of the *Skweres* Complaint. The Release, however, also provides for the discharge of claims that "could have been asserted" in the *Skweres* litigation. The two provisions exist in harmony; in other words, it is eminently reasonable to read the Release as pertaining to claims arising out of and connected to the *Skweres* incident, and also claims that could have been brought in the *Skweres* litigation. Moreover, while the latter clause uses the term "dismissal" and the former uses the term "release," the words "dismiss" and "release" are synonymous. "Dismiss" *Roget's 21st Century Thesaurus, Third Edition* (2009). <u>Absent inconsistency or conflict, the presence of both specific and general language does not produce ambiguity</u>. The Court notes, too, that the Release, which was captioned a "General Release," contains no exclusionary language or carve-out that might apply to the present claims. Further, the Release provides that it sets forth the parties' entire agreement. There is no consideration that would preclude straightforward application of the Release, read as a whole, and with the required efforts to give effect to all of the contractual terms and avoid strained contrivance. Accordingly, the plain meaning of those terms must be given effect. . . .

*Kitt*, 2016 WL 640534, at *4 (emphasis added).

As with the release agreement involved in *Kitt*, the Employment Agreement here contains both specific and general language in §§ 12.1, 12.2, 12.3 and 12.4. That § 12.3 regarding "Termination for Cause" <u>specifies</u> in subsections 12.3.i and 12.3.ii that serious offenses and incapacity constitute cause, does not mean their existence are *conditio sine qua non*[10] for a termination for cause. For example, § 12.4 specifies certain additional procedural requirements regarding a termination for any serious offense that by its terms does not also apply to a termination for incapacity—the two sub-clauses in § 12.3, (i) and (iii), stand as independent bases for termination with differing procedures. To endorse Rev. Lee's approach that only a serious offense or incapacity constitutes cause would be to ignore the broad language of § 12.3 generally and as previously discussed also would require that the Court insert the term "only" into the sentence stating that a serious offense or incapacity constitute cause as a restriction not

---

[10] *Conditio sine qua non* is Latin meaning a condition that without which the thing cannot be. Black's Law Dictionary, 293, 1385 (6th Ed. 1990).

mentioned in the contract—something which it will not and cannot do.  The specific and general language under § 12.3, including § 12.3.i and 12.3.ii, and §12.4 regarding procedures for terminations for cause do not render the "by law" and "other grounds" provisions ambiguous.

The Court recognizes that under Pennsylvania law there exists a strong presumption in favor of employment at will:

> [d]espite the principle of contractual interpretation that courts must ascertain and give effect to the parties' intent, employment law creates a presumption which may be contrary to that intent. An employment agreement is presumptively terminable at will by either party. The employee may leave the job for any or no reason or the employer may terminate the employee for any cause or no cause.

*Greene v. Oliver Realty, Inc.,* 526 A.2d 1192, 1196 (Pa. Super. Ct. 1987) (proof of an agreement that is not at will but for a specific duration terminable for "just cause" requires clear proof). The law regarding "employment at will," however, does not provide useful guidance here because the termination without cause provision of § 12.2 provides essentially the same ability to terminate as found in employment at will—but with the financial consequences of the liquidated damages provision.  More importantly, § 12.3 specifically governs termination for cause.  That being said, one right or ground for a termination "by law" in addition to material breach readily presents itself for required consideration by the Court:  the right of a religious institution to be unfettered in selecting its ministerial leaders, particularly its lead Pastor, as embodied in the ministerial exception, discussed further *infra*.

Rev. Lee's interpretation of the contract runs counter to contract interpretation principles. As explained by the court in <u>ClinMicro Immunology Ctr., LLC v. PrimeMed, P.C.</u>, No. 3:CV-11-2213, 2014 WL 1515709, at *5–7 (M.D. Pa. Apr. 15, 2014):

> Contractual ambiguities, under Pennsylvania law, can be either patent or latent: a patent ambiguity appears on the face of the instrument, [while] a latent ambiguity arises from extraneous or collateral facts which make the meaning of a written agreement uncertain although the language thereof, on its face, appears

clear and unambiguous. A party may use extrinsic evidence to support its claim of latent ambiguity, but this evidence must show that some specific term or terms in the contract are ambiguous; it cannot simply show that the parties intended something different that was not incorporated into the contract. Lest the ambiguity inquiry degenerate into an impermissible analysis of the parties' subjective intent, such an inquiry appropriately is confined to the parties linguistic reference. The parties' expectations, standing alone, are irrelevant without any contractual hook on which to pin them.

Moreover, when a party suggests an alternative meaning to a term in an agreement, that meaning must be reasonable, and "courts must resist twisting the language of the contract beyond recognition" because "the meaning of language cannot be distorted to establish the ambiguity." . . . . Pennsylvania authority on contract ambiguity establishes that: (1) the mere disagreement between the parties as to the meaning of a term is insufficient to establish an ambiguity; (2) each party's proffered interpretation must be reasonable and that there must be evidence in the contract to support the interpretation beyond the party's simple assertion of ambiguity; and (3) the proffered interpretation cannot contradict the common understanding of the disputed term or phrase when there is another term that the parties could easily have used to convey this contradictory meaning.

Thus, [t]o summarize: a contract that is unambiguous on its face must be interpreted according to the natural meaning of its terms, unless the contract contains a latent ambiguity, whereupon extrinsic evidence may be admitted to establish the correct interpretation. However, a claim of latent ambiguity must be based on a "contractual hook": the proffered extrinsic evidence must support an alternative meaning of a specific term or terms contained in the contract, rather than simply support a general claim that the parties meant something other than what the contract says on its face.... Furthermore, a proffered alternative meaning for the contractual hook must be reasonable; that is, it must be supported by contractual evidence that goes beyond the party's claim that the contractual hook has a certain meaning, and the interpretation cannot contradict the standard meaning of a term when the parties could have easily used another term to convey this contradictory meaning. In determining whether latent ambiguity exists in a facially unambiguous contract, a court must consider whether the extrinsic evidence that the proponent of the alternative interpretation seeks to offer is the type of evidence that could support a reasonable alternative interpretation of the contract, given the foregoing principles. Finally, a court can consider an alternative interpretation of a facially unambiguous contract term when the plain meaning interpretation of the contract would lead to an absurd and unreasonable outcome.

*ClinMicro Immunology Ctr., LLC*, 2014 WL 1515709, at *5–7 (internal citations and quotations omitted).

The parties clearly disagree regarding the articulated rights to terminate for cause under the Employment Agreement, however, Rev. Lee offers <u>no</u> alternative interpretation of the language relied on by the Church because, perhaps by necessity, he <u>intentionally ignores the language by his use of carefully selected excerpts</u>, by failing to address it in his filings, and by admitting of no possible basis for cause other than the serious offense and incapacity provisions in § 12.3(i) and (ii). (Tr. 5/12/17 at 12, 16, 17). No "contractual hook" is urged for any latent ambiguity.

Turning to the provisions cited previously by the Court and the Church, Termination for Cause § 12.3, though broad, does not transform the provisions into an employment-at-will "for any reason, or no reason at all" provision under Termination for Cause. The Agreement itself admits of the right to terminate without cause governed by § 12.2 entitled Termination without Cause, and providing certain rights thereunder. Additionally, the "allowed by law" or "other ground" provisions appear under Termination for Cause § 12.3. In accordance with the rules of last antecedent and superfluidity, and the supplementary "rule of punctuation," an interpretation of the contract limiting termination for cause to only a serious offense or incapacitation would be flawed as would an interpretation rendering the "allowed by law" or "other ground under this Agreement" provision equivalent to a no cause provision. "Allowed by law" means just that—if federal or Pennsylvania law provides the Church cause or the right to terminate the contract, and the Church bases a termination on that cause, then the liquidated damages provision for termination without cause does not apply by the very terms of the contract. Thus, the breadth of this provision does not destroy its plain meaning.

### 1. *Last-Antecedent Rule*

Pennsylvania law permits application of the last antecedent rule. *Synthes USA Sales, LLC v. Harrison,* 83 A.3d 242, 251–52 (Pa. Super. Ct. 2013).

> A court may employ the last antecedent rule in construing statutes and contracts: [T]he grammatical "rule of the last antecedent," according to which a limiting clause or phrase ... should ordinarily be read as modifying only the noun or phrase that it immediately follows. While this rule is not an absolute and can assuredly be overcome by other indicia of meaning, we have said that construing a statute in accord with the rule is quite sensible as a matter of grammar.

*Harrison,* 83 A.3d at 251 (internal quotations and citations omitted) (citing *Barnhart v. Thomas,* 540 U.S. 20, 26, 124 S.Ct. 376, 380, 157 L.Ed.2d 333, 340 (2003)).

The Employment Agreement includes under termination for cause the following: termination for material breach, grounds for termination "allowed by law," or grounds for termination under other provisions of the Agreement, § 12.3, a serious offense, § 12.3.i, or incapacitation, § 12.3.ii. Here, under the last antecedent rule, the procedural requirement § 12.4 stating that "if this Agreement is proposed to be terminated by the Church <u>for cause as a result of the Pastor committing any serious offense</u>" and "if the Board recommends a termination of this Agreement <u>for cause based on any serious offense</u>" restricts § 12.4 to a serious offense and admits of other reasons for cause in § 12.3 for which the procedures in § 12.4 would not be required. There can be no doubt that § 12.3 encompasses several bases to terminate for cause and then distinguishes them.

The Court of Appeals for the Third Circuit has explained the last-antecedent rule:

> The last-antecedent rule is a canon of statutory interpretation, but we have extended application of the rule to a life insurance policy as well. The rule provides that qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding and not to others more remote. In other words, if a sentence reads "A or B with respect to C," it should be interpreted as containing two items: (1) "A" and (2) "B with respect to C." However, the last-antecedent rule is not an absolute and can assuredly be overcome by other indicia of meaning.

*Viera v. Life Ins. Co. of N. Am.,* 642 F.3d 407, 418–19 (3d Cir. 2011) (internal citations and quotations omitted).

The Court further observed that interpreting the contract at issue:

> The District Court appropriately looked to and analyzed the indicia of meaning in the Policy so as not to contort the language beyond its limits. Where the meaning of the contract language is clear, the last-antecedent rule should not be used to create ambiguity.
>
> Plaintiff also argues that the inherent ambiguity in the plan must be construed against [the defendant] under the doctrine of *contra proferentem.* Whether an ambiguity exists is a question of law. Under Pennsylvania law, an insurance contract is ambiguous where it: (1) is reasonably susceptible to different constructions, (2) is obscure in meaning through indefiniteness of expression, or (3) has a double meaning. To be sure, we must construe ambiguous policy provisions against the drafter of the contract once a determination of ambiguity has been made, but the language at issue here is not ambiguous. As noted above, Plaintiff's alternative reading of the provision under the last-antecedent rule is not reasonable. Disagreement between the parties over the proper interpretation of a contract does not necessarily mean that a contract is ambiguous. Where there is only one reasonable interpretation of a contract, that interpretation controls because [s]traightforward language in an insurance policy should be given its natural meaning.

*Viera,* 642 F.3d at 419–20 (internal citations and quotations omitted).

### *2. Superfluidity*

Pennsylvania also applies the rule against superfluidity. *See Capek*, 767 A.2d at 1050 ("In construing a contract, we must determine the intent of the parties and give effect to all of the provisions therein.") (internal citations and quotations omitted). The rule is the principle that the court will not read one provision so as to render another provision of the contract superfluous. *Rcn Corp. v. Paramount Pavilion Grp., LLC.*, 164 F. App'x 291, 296 (3d Cir. 2006); *see also Dubrosky v. Colonial Life & Acc. Ins. Co.,* 129 F. App'x 691, 693 (3d Cir. 2005) ("This interpretation must be rejected under the cardinal principle that each term of a contract should be given meaning so that no term is superfluous.") (internal citations and quotations omitted).

> [A] contract should be read so as to give meaning to all of its terms when read as an entirety.  Accordingly, a construction which neutralizes any provision of a contract should never be adopted if the contract can be so construed as to give effect to all the provisions. The meaning of a particular phrase is not properly determined by considering the phrase in isolation but by reading it in harmony with the rest of the contract.

*Contrans, Inc. v. Ryder Truck Rental, Inc.,* 836 F.2d 163, 169 (3d Cir. 1987) (internal citations and quotations omitted); *see also  Meyer v. CUNA Mut. Ins. Soc.,* 648 F.3d 154, 167 (3d Cir. 2011 (citing Pennsylvania law).  Therefore, a contract interpretation is disfavored "that render[s] at least one clause superfluous or meaningless." *Sloan & Co. v. Liberty Mut. Ins. Co.,* 653 F.3d 175, 181 (3d Cir.2011) (internal citations and quotations omitted).

In this Employment Agreement, the phrase "by law" is not included under the provision governing termination <u>without cause</u>, but instead is delineated under the provision governing termination <u>for cause</u>.  Moreover, if the phrase "by law" was meant somehow to be included under the provision without cause resulting in liquidated damages it would be rendered meaningless, because no cause is required for a termination <u>without cause</u>, and thus, superfluous having no effect at all.  Being included within the section delineating termination with cause, the phrase "by law" is interpreted as a basis for termination for cause as established in case or statutory law, not entitling Rev. Lee to liquidated damages on such a termination.  Interpretation of the phrase "by law" as providing a basis for termination <u>for cause</u> also adheres to the rule against superfluidity.

### 3.   Contra Proferentem

Without making any argument regarding it, Rev. Lee points out in his brief, that the Agreement was drafted by the "Church's counsel."[11]  (Docket No. 82 at 8).  It appears that Rev. Lee may have intended at some point, but it is no means clear, to argue application of *contra*

---

[11] Rev. Lee disavowed at argument that he was raising any matter regarding whether he had adequate counsel prior to entering the Employment Agreement.  (Tr. 5/12/17 at 42).

*proferentem*, which means "against the offeror." *U.S. Fire Ins. Co. v. General Reinsurance Corp.*, 949 F.2d 569, 573 (2d Cir. 1991). Regarding this Employment Agreement the *maxim* would not apply because the parties expressly provided in § 18 that it was the product of negotiations and for it not to be interpreted "against any party based upon the source of the draftsmanship hereof." Thus, Rev. Lee would not be able to take advantage anywhere of the "general maxim that ambiguous contract language should be construed against the drafter." *Viera v. Life Ins. Co. of N. Am.,* 642 F.3d 407, 418 (3d Cir. 2011).

### C.     *Parol Evidence and Ambiguity*

Generally, under Pennsylvania law:

> [o]nly where a contract's language is ambiguous may extrinsic or parol evidence be considered to determine the intent of the parties. A contract contains an ambiguity if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. This question, however, is not resolved in a vacuum. Instead, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. In the absence of an ambiguity, the plain meaning of the agreement will be enforced. The meaning of an unambiguous written instrument presents a question of law for resolution by the court.

*Murphy v. Duquesne University of the Holy Ghost,* 777 A.2d 418, 429–30 (Pa. 2001) (citations and quotation marks omitted) (parole evidence only considered if contract's language is ambiguous). Rev. Lee also has disavowed any ambiguity in the Employment Agreement. (Tr. 5/12/17 at 25, 42).

### 1.  *Exceptions to Parol Evidence Rule:*
### *Fraud in the Execution and Fraud in the Inducement*

"Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract," *Yocca v. Pittsburgh Steelers Sports, Inc.,* 854 A.2d 425, 436 (Pa. 2004), except for

example where its terms are ambiguous or the product of fraud.  854 A.2d at 437.  An integration clause, stating that it is the parties' entire agreement, such as contained in this Employment Agreement, means that the agreement is the parties' entire contract and encompasses the parties' negotiations, conversations, and agreements up to that point in time.  854 A.2d at 436.

The nature of alleged fraud determines the extent that parol evidence may be considered. *Youndt v. First Nat. Bank of Port Allegany*, 868 A.2d 539, 546 (Pa. Super. Ct. 2005).  "One exception to the parol evidence rule applies for cases of fraud in the execution in which the party proffering the evidence contends that he executed the agreement because he was defrauded by being led to believe that the document contained terms that actually were omitted therefrom." *Id.* at 546 (internal citations and quotations omitted).    Another exception, is fraud in the inducement.  "[P]arol evidence is admissible to prove such a claim under certain circumstances. In a case of fraud in the inducement, the party proffering evidence of additional prior representations does not contend that the representations were omitted from the written agreement, but, rather, claims that the representations were fraudulently made and that 'but for them' he would never have entered into the agreement." *Id.* (internal citations and quotations omitted).  Fraud in the inducement allegations, however, will not permit consideration of parol evidence "where the contract contains terms that deny the existence of representations regarding the subject matter of the alleged fraud." *Id.*

The Church has asserted as defenses both fraud in the execution and fraud in the inducement, which again Rev. Lee never addresses.  These defenses are based on statements made by Rev. Lee to the Congregation, assurances as to what "cause" for termination meant and that he "gave" the Congregation that clause so they could rest assured if they approved the Employment Agreement, affirmative statements to the Congregation that Rev. Lee now appears

to disavow by his contrary position that serious offense and incapacity are the only bases for cause under the Contract and absent that he is entitled to reap the rewards he seeks as sown through § 12.2. Yet, Rev. Lee fully admitted making these statements in the context of seeking the required approval by the Congregation of the Employment Agreement. *See, e.g.* (Deposition Cite; Tr. 5/12/17 at 53; Docket No. 87 at ¶¶ 27, 28; Rev. Lee Depo. at 74). In reviewing these statements, including statements in the Church minutes from the meetings prior to congregational approval of the Employment Agreement, the Resolution providing approval by the Congregation, and the purposes for which Rev. Lee made them, they lend support to the Church's asserted defenses, making it difficult to understand just how Rev. Lee ever envisioned that his motion for summary judgment could succeed. Rev. Lee's utter failure to address the Church's defenses doomed his motion for summary judgment.

### D. First Amendment: Ministerial Exception, Free Exercise of Religion, and Establishment Clause Excessive Entanglement Considerations

The Court raised with the parties prior to the hearing and must now decide whether this matter should be dismissed based on First Amendment concerns. The decision of who should be the head of a religious institution is ordinarily left to that institution unfettered and without court review. This principle is firmly established in both federal and Pennsylvania law. Neither party initially addressed this salient issue that quite readily presents itself in any case contesting the termination of the *lead Pastor* of a church. Peppered throughout the filings in this matter are core church doctrine, congregational rule and polity, as well as matters of spiritual concern— several matters that threaten curtailment of free exercise and excessive entanglement by this Court. These issues must be fleshed out as it were prior to any possible trial, as admitted by the parties. (Tr. 5/12/17 at 31, 34-35, 37, 43, 46-47). The time for the Court to take up the laboring oar is now.

### *1. Ministerial Exception*

The "ministerial exception" applies to Lead Pastors, such as Rev. Lee, but also to other ministerial employees. Whether the ministerial exception applies "rests not on [] ordination status or [] formal title, but rather on [] functional status as the type of employee that a church must be free to appoint or dismiss in order to exercise the religious liberty that the First Amendment guarantees." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.,* 565 U.S. 171, 206 (2012) (Alito, J., concurring). In certain religious institution employment cases, the court is tasked with determining if the employee serves in a ministerial capacity. *Petruska*, 462 F.3d at 304 n.6 (determining that ministerial function is satisfied where the individual's "primary duties include teaching, spreading the faith, church governance, supervision of a religious order, or supervision of participation in religious ritual worship."). It is beyond purview that Rev. Lee as the head Pastor of the Church served in a ministerial capacity.

*Hosanna-Tabor* involved a challenge to application of anti-discrimination statutes to religious institutions. In that case, the Supreme Court reaffirmed the ministerial exception and the deference afforded religious institutions in selecting their leaders, under both the First Amendment's Free Exercise and Establishment Clauses:

> We agree that there is such a ministerial exception. The members of a religious group put their faith in the hands of their ministers. Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs. By imposing an unwanted minister, the state infringes the Free Exercise Clause, which protects a religious group's right to shape its own faith and mission through its appointments. According the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions.

565 U.S. at 189 (emphasis added). *Hosanna-Tabor* unequivocally provides that: "the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone." *Id.* at 195 (internal citation and quotation omitted).

The Supreme Court observed in *Hosanna–Tabor*:

> The case before us is an employment discrimination suit brought on behalf of a minister, challenging her church's decision to fire her. Today we hold only that the ministerial exception bars such a suit. We express no view on whether the exception bars other types of suits, including actions by employees alleging breach of contract or tortious conduct by their religious employers. There will be time enough to address the applicability of the exception to other circumstances if and when they arise.

*Id.* at 196. The Court clarified that:

> [t]he purpose of the exception is not to safeguard a church's decision to fire a minister only when it is made for a religious reason. The exception instead ensures that the authority to select and control who will minister to the faithful—a matter strictly ecclesiastical—is the church's alone.

*Id.* at 194–95 (internal citations and quotations omitted).

As noted, *Hosanna-Tabor* specifies: "[a]ccording the state the power to determine which individuals will minister to the faithful also violates the Establishment Clause, which prohibits government involvement in such ecclesiastical decisions." *Id.* at 188-189; (Docket No. 90 at 4). In concurring, Justice Samuel Alito explained:

> The "ministerial" exception should be tailored to this purpose. It should apply to any "employee" who leads a religious organization, conducts worship services or important religious ceremonies or rituals, or serves as a messenger or teacher of its faith. If a religious group believes that the ability of such an employee to perform these key functions has been compromised, then the constitutional guarantee of religious freedom protects the group's right to remove the employee from his or her position.

*Hosanna-Tabor*, 565 U.S. at 199 (Alito, J. concurring).

Justice Alito further elaborated on the important constitutional protection furthered by the ministerial exception:

> When it comes to the expression and inculcation of religious doctrine, there can be no doubt that the messenger matters. Religious teachings cover the gamut from moral conduct to metaphysical truth, and both the content and credibility of a religion's message depend vitally on the character and conduct of its teachers. A religion cannot depend on someone to be an effective advocate for its religious vision if that person's conduct fails to live up to the religious precepts that he or she espouses. For this reason, a religious body's right to self-governance must include the ability to select, and to be selective about, those who will serve as the very "embodiment of its message" and "its voice to the faithful." *Petruska v. Gannon Univ.,* 462 F.3d 294, 306 (C.A.3 2006). A religious body's control over such "employees" is an essential component of its freedom to speak in its own voice, both to its own members and to the outside world.
> The connection between church governance and the free dissemination of religious doctrine has deep roots in our legal tradition:
>> The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual members, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them reversed.
> *Watson v. Jones,* 13 Wall. 679, 728–729, 20 L.Ed. 666 (1872).
> The "ministerial" exception gives concrete protection to the free "expression and dissemination of any religious doctrine." The Constitution leaves it to the collective conscience of each religious group to determine for itself who is qualified to serve as a teacher or messenger of its faith.

*Hosanna-Tabor,* 565 U.S. at 200–02 (Alito, J., concurring).

Thus, in *Hosanna-Tabor*, Justice Alito explained the difficulties posed in cases involving termination of religious leaders or ministerial employees:

> For civil courts to engage in the pretext inquiry that respondent and the Solicitor General urge us to sanction would dangerously undermine the religious autonomy that lower court case law has now protected for nearly four decades. In order to probe the *real reason* for respondent's firing, a civil court—and perhaps a jury— would be required to make a judgment about church doctrine. The credibility of

> Hosanna–Tabor's asserted reason for terminating respondent's employment could not be assessed without taking into account both the importance that the Lutheran Church attaches to the doctrine of internal dispute resolution and the degree to which that tenet compromised respondent's religious function. If it could be shown that this belief is an obscure and minor part of Lutheran doctrine, it would be much more plausible for respondent to argue that this doctrine was not the real reason for her firing. If, on the other hand, the doctrine is a central and universally known tenet of Lutheranism, then the church's asserted reason for her discharge would seem much more likely to be nonpretextual. But whatever the truth of the matter might be, the mere adjudication of such questions would pose grave problems for religious autonomy: It would require calling witnesses to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission.

*Hosanna-Tabor,* 565 U.S. at 205-06 (Alito, J., concurring).

Pennsylvania law likewise recognizes the "ministerial exception" and its purpose not to intrude into the autonomy of religious institutions to make decisions regarding who will lead it. *Connor v. Archdiocese of Philadelphia*, 975 A.2d 1084, 1109–10 (Pa. 2009). *Connor* referred to the "ministerial exception" as a deference rule regarding employment decisions of a religious institution and its ministers. The *Connor* court explained:

> the concern in ministerial exception cases is not with chilling just any speech by religious institutions but, rather, that which is necessary to make an informed decision about the selection and retention of their own personnel. As one decision cited by appellees explains, "to allow as actionable church members' comments about their church leaders made at church meetings would inhibit the free and open discourse essential to a religious institution's selection of its minister. Such a result could chill expressions of dissatisfaction from church members and thereby intrude upon the autonomy of religious institutions to freely evaluate their choice and retention of religious leaders."

*Connor*, 975 A.2d at 1110 (internal citations and quotations omitted).

Accordingly, the "ministerial exception" recognizes the right of a religious institution in exercising its First Amendment guarantee of religious liberty and autonomy in matters ecclesiastical to terminate from employment a Pastor such as Rev. Lee. Rev. Lee's dispute with the Church regarding his termination from employment fully implicates such rights.

## 2. Consideration of the Ministerial Exception Is Appropriate in this case

The Supreme Court also indicated in a footnote in *Hosanna-Tabor*, that the ministerial exception's protection of free exercise (as opposed to excessive entanglement) was not a jurisdictional bar but rather an "affirmative" defense:

> A conflict has arisen in the Courts of Appeals over whether the ministerial exception is a jurisdictional bar or a defense on the merits. *Compare Hollins*, 474 F.3d, at 225 (treating the exception as jurisdictional); and *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1038–1039 (C.A.7 2006) (same), with *Petruska*, 462 F.3d, at 302 (treating the exception as an affirmative defense); *Bryce*, 289 F.3d, at 654 (same); *Bollard v. California Province of Soc. of Jesus*, 196 F.3d 940, 951 (C.A.9 1999) (same); and *Natal*, 878 F.2d, at 1576 (same). We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is "whether the allegations the plaintiff makes entitle him to relief," not whether the court has "power to hear [the] case." *Morrison v. National Australia Bank Ltd.*, 561 U.S. ——, ——, 130 S.Ct. 2869, 2877, 177 L.Ed.2d 535 (2010) (internal quotation marks omitted). District courts have power to consider ADA claims in cases of this sort, and to decide whether the claim can proceed or is instead barred by the ministerial exception.

*Hosanna-Tabor,* 565 U.S. at 195, n. 4.

Admittedly, there is tension in Federal Rule of Civil Procedure 8 between 8(b) and 8(c) regarding "avoidance or affirmative defense" under 8(c) as opposed to denials and other defenses under 8(b).  As explained by one treatise:

> Federal Rule 8(c) requires that a responsive pleading must set forth certain enumerated substantive defenses as well as "any other matter constituting an avoidance or affirmative defense." This subdivision of the basic pleading rule deals with affirmative defenses and should be read in conjunction with, and distinguished from, Rule 8(b), which deals with denials or negative defenses that directly contradict elements of the plaintiff's claim for relief.

> Rule 8(c) is a lineal descendent of the common law plea by way of "confession and avoidance," which permitted a defendant who was willing to admit that the plaintiff's declaration demonstrated a prima facie case to then go on and allege additional new material that would defeat the plaintiff's otherwise valid cause of action.

Wright & Miller, 5 Fed. Prac. & Proc. Civ. § 1270 (Affirmative Defenses—In General) (3d ed.).

The Supreme Court and the Third Circuit's use of the term "affirmative defense" to refer to preservation in litigation of the religious institution's free exercise rights should not stop this Court's inquiry where the "ministerial exception" is not asserted by name in pleadings with the label "affirmative defense." First, the "ministerial exception" is fairly incorporated into the Employment Agreement itself by virtue of its broad language referring to termination rights "by law;" and secondly, the Supreme Court referred to the exception as a "defense on the merits." Here, the Church has advanced its rights to terminate Rev. Lee based on his failures as the Church's lead Pastor as its "defense on the merits" and also as Rev. Lee's material breach of the Employment Agreement. The Church also specifically set forth as affirmative defenses Rev. Lee's failure of performance under the Employment Agreement and that any breach by the Church where Rev. Lee materially breached the Employment Agreement would not have been a material breach by it. (Docket No. 71 at ¶¶ 49, 58).

The question then is has the Church sufficiently satisfied the requirement that the ministerial exception's free exercise protection be asserted as an affirmative defense? In this Court's estimation, the Church has adequately raised and preserved the matter. The Church has defended this action on the grounds that it did not breach the contract and has relied on the Agreement's specific provision permitting termination by right as permitted by law. Indeed, the exhibits attached by Plaintiff to his motion assert the right of the Church and Congregation to determine certain matters, such as who will lead the flock and control and direction of the Church. (Docket No. 76-3 at 11, ¶ 6). Under the particular facts of this case, the right for a Church to determine who will lead it, unfettered, reasonably could be construed as an ordinary defense asserting that the contract could not be breached by the Church doing just that— determining who will lead it. Alternatively, since this section of the Agreement, providing a

basis for termination, and the Church's indication that it had the right to terminate Rev. Lee for, *inter alia*, failures in spiritual stewardship and leadership, was asserted by the Church in multiple filings and in Rev. Lee's own filings, Rev. Lee clearly was on notice of the defense. Finally, even if the ministerial exception regarding free exercise were not somehow preserved, excessive entanglement prohibited by the Establishment Clause operates as an impediment to Rev. Lee's further prosecution of this matter. The Court will now address whether the ministerial exception as it related to free exercise operates as a bar and then will address excessive entanglement concerns.

### 3. Whether the Ministerial Exception Is Abrogated by the Employment Agreement

Caselaw indicates that parties can by contract possibly alter their relationship to avoid application of the ministerial exception as it relates to free exercise. In *Petruska v. Gannon Univ.,* 462 F.3d 294, 310 (3d Cir. 2006), the Court of Appeals for the Third Circuit considered the ministerial exception in a case involving a breach of contract where the allegations included that the educational institution employing the plaintiff changed plaintiff's right to serve on the President's Staff and lead the Chaplain's Division as part of her position. In discussing the breach of contract claim, the Court observed:

> Unlike the duties under Title VII and state tort law, contractual obligations are entirely voluntary. As the court noted in *Minker v. Baltimore Annual Conference of United Methodist Church,* 894 F.2d 1354, 1360 (D.C.Cir.1990), "[a] church is always free to burden its activities voluntarily through contract, and such contracts are fully enforceable in civil court." Enforcement of a promise, willingly made and supported by consideration, in no way constitutes a state-imposed limit upon a church's free exercise rights. Accordingly, application of state law to Petruska's contract claim would not violate the Free Exercise Clause.

*Petruska,* 462 F.3d at 310 (internal citations omitted).

*Petruska* did not hold that all contracts would render the ministerial exception meaningless, just that the parties might eliminate its effect as to free exercise concerns by

agreement. The Employment Agreement by its plain terms encompasses the ministerial exception in the "by law"[12] provision in § 12.3 and although the exception might be abrogated, in this case the Court determines that it was not. To the Court's mind, § 12.3 governing termination for cause actually encompasses the ministerial exception by its terms preserving other rights for termination under or "by law," such that what is described as the exception to the ministerial exception—voluntary burden of free exercise by a religious institution as opposed to government (or court) burden of it—was not abrogated by this contract.[13]

Petruska specifically acknowledged that a contract claim also might raise excessive entanglement concerns under the Establishment Clause of the United States Constitution, where resolution of that claim would result in inquiry as to the ecclesiastical policy of the religious institution. 462 F.3d at 311-312. Where the particular breach of contract claim can be decided without a state-imposed limit on free exercise and without excessive entanglement under the Establishment Clause, the case can continue forward. A court might determine that a breach of contract claim initially does not require such a prohibited inquiry, but subsequently may find excessive entanglement issues. 462 F.3d at 312. The Court further instructed in Petruska that where the religious institution's response to the plaintiff's claims raise issues that would result in excessive entanglement, including inquiry into the religious institution's mission, doctrine or other ecclesiastical inquiry, "the claims may be dismissed on that basis on summary judgment." 462 F.3d at 211-312. That a religious institution might burden its free exercise voluntarily by

---

[12] Supreme Court caselaw and the United States Constitution are within the plain meaning of the term "law."

[13] A potential problem presents with the view that the ministerial exception is encompassed in that it might potentially effectively gut § 12.2, in violation of the rule against superfluidity. But given overarching constitutional implications of the ministerial exception, that rule would appear to give way. Additionally, the Church admits that if the Church had offered no reason or no real cause for termination, then § 12.2 would be in play and § 12.2 would have potential effect. The Church appeared to argue at the hearing that it was the sole arbiter of whether it had indicated cause or no cause, which Rev. Lee rightly contested. (Tr. 5/12/17 at 28, 40). The Church did not offer any support to establish it unilaterally determines whether it has offered cause or no cause. The Court rejects this approach because the Court is fully capable of determining in the first instance whether the reasons asserted by the Church and Congregation for terminating Rev. Lee implicate only the "without cause" provision.

contract might eliminate free exercise concerns, but that would not resolve excessive entanglement concerns.

Rev. Lee posits that there is no First Amendment problem at all because his claim concerns his alleged entitlement as a matter of law to an award of damages as specified in § 12.2 for terminations without cause, and involves no determination of whether the Church was right or wrong in the Congregation's decision to terminate him as its lead Pastor for failures in spiritual stewardship, financial stewardship and responsiveness to Church leaders. (Docket No. 91 at 5-6).[14]

The Church's arguments and evidence on material breach crystallize the excessive entanglement issues presented by this case. Rev. Lee, although given ample opportunity, has not shown to the Court's satisfaction that an award to him is simply a foregone conclusion under the contract, requiring no consideration by the court and jury of ecclesiastical matters.

---

[14] *Hosanna-Tabor* noted specifically that an award of relief in a discrimination suit such as backpay and compensatory damages "would be no less prohibited by the First Amendment than an order overturning the termination. Such relief would depend on a determination that [the Church] was wrong to have relieved [the minister] of her position, and it is precisely such a ruling that is barred by the ministerial exception." 565 U.S. at 194. Rev. Lee argues that the contract claim here is distinguishable because an award of damages to Rev. Lee would not operate as a penalty on the Church for terminating an unwanted minister because it does not matter whether the Church was right or wrong in its decision and he does not challenge the validity of the employment decision or the authority of the Church to make it, but only seeks to enforce the terms of the Agreement as a result of the Church's decision. (Docket No. 91 at 6). Thus, Rev. Lee's position is that the Church was free to terminate his employment, but that it just has to pay for that decision. *Id.* at 7.

This approach reveals a potential conflict with *Hosanna-Tabor*'s instruction that enforcement of the penalty for termination of a minister's employment by a religious institution is tantamount to a decision that the religious institution was wrong in terminating that minister, which interferes with the religious institution's right to choose who will lead it—an ecclesiastical matter strictly left to the religious institution. This is not a case where the breach of contract claim is in terms of assignments, vacation time, rate of pay, or a stipend, but instead is a claim that goes to the heart of the Church and Congregation's decision that it no longer wanted Rev. Lee to lead it for various failings. A ruling in favor of Rev. Lee conceivably could still be viewed as a punishment inflicted by a court against a church for terminating its head pastor—which threatens to evade the very spirit and purpose of the ministerial exception. Enforcement of the resulting judgment appears to be the very punishment of a church for failing to retain an unwanted minister that the Supreme Court determined would "intrude[] upon more than a mere employment decision." 565 U.S. at 188. It is not lost on the Court that the particular employment decision is not regarding just any ministerial employee, as was involved in the seminal cases of *Hosanna-Tabor* and *Petruska*—here it involves the Church's head Pastor. Nevertheless, *Hosanna-Tabor* and *Petruska* pre-suppose that a judgment in contract in favor of a former pastor and against a church might under some circumstances pass muster. Given this Court's position that the Employment Agreement at issue here encompasses application of the ministerial exception and also that excessive entanglement concerns bar this matter proceeding any further, the import of such a judgment need not be resolved.

## A. Ministerial Exception and "Exception to the Exception" in Cases involving Employment Contracts

As is evident in this Court's discussion, the ministerial exception cases address issues of free exercise under the First Amendment imbued with establishment clause concerns necessarily resulting in some overlap in the relevant considerations. Rev. Lee argues a "narrow" application of the ministerial exception envisioned by *Hosanna-Tabor*. (Docket No. 91 at 5). To the contrary, the Supreme Court in *Hosanna-Tabor* did not announce a rule to be narrowly applied, rather it addressed the ministerial exception in the context of a statutory employment discrimination case and indicated it was expressing no view at the time regarding the import of its decision on other claims, such as a breach of contract claim. The Supreme Court explained:

> Given [prior] understanding of the Religion Clauses—and the absence of government employment regulation generally—it was some time before questions about government interference with a church's ability to select its own ministers came before the courts. This Court touched upon the issue indirectly, however, in the context of disputes over church property. Our decisions in that area confirm that it is impermissible for the government to contradict a church's determination of who can act as its ministers.

*Hosanna-Tabor*, 565 U.S. at 185.

The Church acknowledges what the Supreme Court and the Third Circuit noted as an exception to the exception, which is the proposition that the Free Exercise clause of the First Amendment may not be implicated where the religious entity voluntarily chose to burden its rights through contract—in that scenario, the religious entity and not the court can be said to have voluntarily placed the constraints on its own free exercise. That a religious entity might put constraints on its own free exercise, would not, however, resolve excessive entanglement concerns.[15] The Church aptly states that "[t]here is no bright line distinction between what might

---

[15] Rev. Lee's position throughout wholly ignores the import of the doctrine against excessive entanglement. A church might, for example, enter into a contract with its pastor that provides for termination only for a failure in spiritual leadership. In that scenario, the church may be said to have "burdened its own right" to Free Exercise, but

be called non-ecclesiastical and what might be assuredly seen to be impinging upon questions of doctrine, especially when the most ministerial of all position is involved, that of the minister him- or herself." (Docket No. 90 at 6). Here the asserted reasons by the Church and Congregation for Rev. Lee's termination implicate ecclesiastical matters, including church doctrine and polity, and threaten the prohibited entanglement.

Rev. Lee relies on the fact that *Petruska*, which the Court notes was decided before *Hosanna-Tabor* and at the motion to dismiss stage, permitted a contract claim brought by a ministerial employee. The breach of contract claim brought by the plaintiff in *Petruska*, however, did not involve termination of the lead Pastor or the right of the church to determine who would lead it, but rather the change in certain assignments in the employment of a ministerial employee. The Third Circuit determined at the motion to dismiss stage that the contract claim was not then barred by the ministerial exception. The Court at the same time expressly noted the application of the ministerial exception required it "to determine only whether the resolution of the plaintiff's claim would limit a church's right to choose who will perform particular spiritual functions." *Petruska*, 462 F.3d at 305, n.8. In considering the plaintiff's particular claims in *Petruska* and applying this test, it determined the ministerial exception did not <u>at that point</u> bar the case from moving forward. That this case involves a breach of contract action brought by the Pastor and the Church, as opposed to some other type of action, does not perforce eliminate excessive entanglement concerns.

### B. Deference Rule and Excessive Entanglement

---

if the church were to terminate its pastor purportedly for failure in spiritual leadership and the pastor then contended he did not have any failure in spiritual leadership, what then should the court do? In the Court's estimation excessive entanglement would rise up as the primary concern in resolving that dispute—whether the pastor failed as a spiritual leader of that church. That very concern has arisen here as an insurmountable barrier to any further progress in this litigation.

The United States Supreme Court in *Serbian Eastern Orthodox Diocese for U.S. of America and Canada v. Milivojech*, 426 U.S. 696 (1976), instructed that matters of internal church government are at the core of ecclesiastical affairs, and where the church establishes rules and regulations for internal discipline and government and ecclesiastical tribunals decide disputes regarding the church's governance and direction, the United States Constitution requires that the courts accept the decisions as binding.  426 U.S. at 724.  In addition to the contractual provisions on cause as specified in § 12.3, the Church also cites to § 2.5, requiring the Pastor to work with the Deacons and the Church to achieve the Church's mission, and the Church Bylaws and Constitution,[16] which the Employment Agreement incorporates through § 7(b) with its provision that Church policies and procedures are to be followed by the Pastor as established by the Church from time to time.  (Tr. 5/12/17 at 50; Docket No. 47-2, Exhibit C).

The Constitution and By-Laws of the Church recognize the Congregation as the highest ecclesiastical authority in the Church and Church governance is vested in its members with "the Lord Jesus the Christ as its only Head."  (Docket No. 47-2, Ex. C, Articles 2 & 5).  They further provide duties and responsibilities of the pastor and tenure of the pastor limited by "his inability or unwillingness to fulfill responsibilities as "under-shepherd of this flock, at which time the church acts according to above order."  (Docket No. 47-2, Ex. C, Article 6).  The By-laws further provide the express indication that the Church functions freely and recognizes "no ecclesiastical authority higher than the local assembly," (Article 2); that the authority of the state must not interfere with the Church's authority, (Article 3); beyond "the Lord Jesus Christ as its only Head," the governance of the Church is vested in its Congregation and it is not amenable to another Ecclesiastical Body, (Article 5); and the Pastor shall have an unlimited tenure subject to

---

[16] Rev. Lee conceded that the Court rightfully could consider the bylaws and constitution as it relates to the Pastor's duties.  (Tr. 5/12/17 at 25).

inability or unwillingness to fulfill his responsibilities as the under-shepherd of the flock. (Article 6, § 6.1). As urged by the Church, this ecclesiastical hierarchy appears under *Hosanna-Tabor* to preserve in this Court's estimation the absolute right and autonomy of the Congregation to determine whether the Pastor was fulfilling his duties to the Church. Assessing, through the vessel of this breach of contract action, the validity of the Congregation's reasons for removing Rev. Lee from their pulpit, and the Congregation's right to do it, undoubtedly strikes at the heart of prohibited ecclesiastical considerations.

The Church cites to one of the "property cases" referred to in *Hosanna-Tabor*, *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440 (1969), and to a similar state law case, *Presbytery of Beaver-Butler of the United Presbyterian Church in the United States of America v. Middlesex Presbyterian Church*, 489 A.2d 1317 (Pa. 1985), regarding the "deference rule" under the Establishment Clause of the First Amendment. The "deference rule" encompasses the doctrine that courts must leave matters ecclesiastical to the Church's domain in avoidance of excessive entanglement. 393 U.S. at 451; 489 A.2d at 1321.

*Mary Elizabeth Blue Hull Memorial Presbyterian Church* focused on the withdrawal of a local church from its membership in the general church and the property dispute between the two that resulted regarding title in the local church of certain church property. The Supreme Court in that case addressed whether the First Amendment circumscribes a civil court's place in resolving a dispute over church property. It reversed the Supreme Court of Georgia's decision upholding a jury award of church property to the local church on the basis of the jury's finding that the general church had abandoned original tenets and doctrine in adopting new tenets and doctrines on which the general church was founded. The Supreme Court ruled that the "courts have no

role in determining ecclesiastical questions in the process of resolving property disputes." 393 U.S. at 447.

Ultimately, the Supreme Court fully instructed:

the First Amendment severely circumscribes the role that civil courts may play in resolving church property disputes. It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are <u>neutral principles of law</u>, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded. But First Amendment values are plainly jeopardized when church property litigation is made to turn on the resolution by civil courts of controversies over religious doctrine and practice. If civil courts undertake to resolve such controversies in order to adjudicate the property dispute, the hazards are ever present of inhibiting the free development of religious doctrine and of implicating secular interests in matters of purely ecclesiastical concern. Because of these hazards, the First Amendment enjoins the employment of organs of government for essentially religious purposes; the Amendment therefore commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine. Hence, States, religious organizations, and individuals must structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions.

*Id.* at 449 (internal citations omitted) (emphasis added). Where resolution of a dispute does not require "the courts to engage in the forbidden process of interpreting and weighing church doctrine," *Id.* at 451, the courts have a proper role in adjudicating the matter.

In *Presbytery of Beaver-Butler*, the Pennsylvania Supreme Court adopted the <u>neutral principles</u> approach espoused by the United States Supreme Court and indicated that the same principles of law apply to religious and non-religious associations where the dispute does not involve or require any ecclesiastical inquiry. 489 A.2d at 1323. The Pennsylvania Supreme Court, however, recognized its prior decisions that required Pennsylvania courts "to yield the gavel to the ecclesiastical hierarchies" where there were religious entanglements presented. *Id.* at 1323.

Although the Court of Appeals in *Petruska* reversed the district court's dismissal of the contract claim and remanded it back to the district court, it did so because it determined that it could not "conclude that review of this claim would, <u>at the outset</u>, unconstitutionally entangle the court in religion." 462 F.3d at 311 (emphasis added).  In so ruling, the Court considered *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971), and determined that the third prong of the *Lemon* test, which considers an excessive government entanglement with religion, applied.  Following its prior opinion in *Geary v. Visitation of Blessed Virgin Mary Parish School*, 7 F.3d 324 (3d Cir. 1993), the *Petruska* court determined that <u>at that stage in the litigation</u> the particular matter did not present entanglement because it determined that the claim at issue had not yet necessarily or inevitably lead to inquiry into the church's religious mission or doctrines or other ecclesiastical inquiry.  *Petruska*, 462 F.3d at 312.  Yet, it cautioned, consistent with *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990), and *Geary*, that if the issues the consideration of which would result in excessive entanglement at a later stage, dismissal would be the appropriate action by the court. *Petruska*, 462 F.3d at 312.

Similarly, "[i]n the D.C. Circuit, the ministerial 'exception does not bar a breach of contract claim when resolution of such a claim is 'subject to entirely neutral methods of proof.'" *Gregorio v. Hoover*, --- F. Supp. 3d ---, 2017 WL 780784, at *4 (D.D.C. Feb. 28, 2017) (quoting *Minker*, 894 F.2d at 1359–61.  *Minker* fully recognized that although a church is free to voluntarily contract, matters of ecclesiastical policy might present and prevent the case from moving forward in court on summary judgment, but if the contract matter may be determined entirely based on neutral principles and without excessive entanglement in religious doctrine, dismissal at an earlier stage may be premature. *Gregorio*, 2017 WL 780784, at *6 (involving minister's breach of contract claim regarding payment of a stipend).

The Church argues that where Rev. Lee failed in spiritual stewardship, financial stewardship and responsiveness to Church leadership, as determined by the Church and its Congregation, his termination was for cause under § 12.3. (Docket No. 90 at 6). The Church explained that the lead Pastor's "duty, the *raison d'etre*, of the Agreement is the Plaintiff's achievement of the goals placed upon him by the Church. His failure to accomplish those goals constituted a material breach of the Agreement and **"cause"** for termination," (*Id.* at 7) (emphasis in original), as determined by the Congregation—in the decisional hierarchy of the Church, the highest ecclesiastical authority. The Church points out in regards to employment of its Pastor:

> a material breach of the Agreement can be of an intangible and unquantifiable spiritual nature. The Agreement, the Plaintiff's statements and his deposition testimony establish that the Plaintiff was hired to be much more than the President of a for-profit organization. His performance was not based solely upon income or even attendance, it was based on <u>the spiritual success of the church</u>.

*Id.* at 9 (emphasis added).

Rev. Lee relies on *Geary*, cited in *Petruska*, in arguing that this case would not cause excessive entanglement as in *Geary* where the case required determination as part of the pretext inquiry as to what motivated the employment decision, as opposed to the validity of the religious institution's beliefs. *Geary*, decided prior to *Hosanna-Tabor* notably did not involve the determination of whether the Church should continue the employment of its lead pastor for failures in spiritual leadership, rather it involved a lay teacher in an elementary school, 7 F.2d at 331, and thus, provides little guidance here. This case presents a very different proposition. The Church consistently has offered as the material breach of the contract Rev. Lee's failures in spiritual stewardship, financial stewardship and responding to Church leaders as determined by

the Congregation in the first instance. Several cases warn that such a context, involving Church doctrine, ecclesiastical matters and matters of polity alters the analysis.

The district court in *Nevius v. Africa Inland Mission Int'l,* 511 F. Supp. 2d 114, 120 (D.D.C. 2007), found the analysis in the context of breach of contract not a facile task. In granting the motion to dismiss the plaintiff's breach of contract claim opined:

> A harder question is posed by Nevius's claim for breach of contract. The First Amendment does not place the internal affairs of religious organizations wholly beyond secular jurisdiction. While the court may not mediate a theological dispute, a plaintiff may nonetheless survive a motion to dismiss her contract claim if she can show that *some* form of inquiry is permissible and *some* form of remedy is available . . . Thus, Nevius could maintain her breach of contract claim in this court if there were "neutral principles of law" which the court could apply without venturing into ecclesiastical territory.
>
> Although principles of contract interpretation can ordinarily be applied in a neutral manner, the court's inquiry in this matter would tread too closely to religious affairs. The terms of the contract (as governed by the by-laws) permitted AIM to terminate Nevius for lack of religious faith or misconduct undermining the "standing" of the mission. Determining whether AIM's termination of Nevius fell within these contractually-permitted parameters—or whether, as Nevius alleges, her termination was motivated by other concerns—would involve inquiring into a core matter of ecclesiastical self-governance not subject to interference by a state. And closely examining AIM's decision to close the Mark 9:37 Project would also involve inquiry into ecclesiastical decisions regarding how best to use the organization's resources, which would also be impermissible. Thus, the court concludes that Nevius's breach of contract claim must also be dismissed.

*Nevius*, 511 F. Supp. 2d at 120 (internal quotations and citations omitted). As in *Nevius*, the basis for the Congregation's decision here not only treads closely to religious affairs, it dives straight into religious waters.

The Court of Appeals for the Second Circuit in another breach of contract action involving a Temple's rabbi held:

> review of Friedlander's claims in this case would require scrutiny of whether she should have, *inter alia,* read more extensively from the Torah at certain services, prepared students for their Bar or Bat Mitzvah more adequately, performed certain pastoral services that were not performed, or followed the Temple's

funeral service policies. A reviewing court would also be required to assess whether any failures rose to the level of "gross misconduct or willful neglect of duty" under the relevant employment contract. We agree with the district court that such review would involve impermissible judicial inquiry into religious matters.

*Friedlander v. Port Jewish Ctr.,* 347 F. App'x 654, 655 (2d Cir. 2009); *see Friedlander v. Port Jewish Ctr.*, 588 F.Supp.2d 428 (E.D. N.Y. 2008) (indicating breach of contract action), *aff'd* 347 F. App'x 654 (2d Cir. 2009).

A recent Pennsylvania case, *Warnick v. All Saints Episcopal Church*, No. 01539 Dec. Term 2011, 2014 WL 11210513, at *10 (Pa. Com. Pl. Apr. 15, 2014), *aff'd,* 116 A.3d 684 (Pa. Super. Ct. 2014), *for text, see* No. 714 EDA 2014, 2014 WL 10753746 (Pa. Super. Ct. Dec. 11, 2014), addressed the ministerial exception as interpreted in the context of a breach of employment contract claim. In finding the claim barred, the trial court explained:

> Similarly, the contract and interference with contract claims relating to All Saints' ending Father Warnick's full-time ministry and choosing not to give him part-time ministry are precluded from civil court analysis because of the deference rule and ministerial exception. Canonical and ecclesiastical discretion are at the core of Church decisions over who can serve as a priest. Father Warnick acknowledges that an employment contract to be a priest could be entered into *only* with the Bishop's approval. Church authorities' and congregants' communications about a priest's continued ministry within a Church also implicate canonical discretion and would require interpreting the Canons in order to assess whether such communications were privileged. Moreover, as discussed more fully in Section B, neither a party to a contract nor any party's agents can tortiously interfere with their *own* contracts. But in order to assess this claim, this Court would have to decide whether the Bishop can be found liable for interfering with alleged contracts—that is, whether he was a third party to those contracts or whether he had to approve those contracts himself; this would again require the Court to interpret the Canons.
> Any such interpretation by this Court of Church law would be an unconstitutional incursion by the state into sacred precincts: the deference rule and the ministerial exception prohibit it, and all of Father Warnick's claims are barred as a result.

*Warnick*, 2014 WL 11210513, at *10 (internal citations omitted).

Like Rev. Lee, (Tr. 5/12/17 at 10), the plaintiff in *Warnick* argued that application of *Hosanna-Tabor* was limited because it involved federal employment discrimination laws. The *Warnick* Court aptly observed:

> The Supreme Court's decision in *Hosanna–Tabor* did not limit the deference rule and ministerial exception to federal employment discrimination law, and the cases Father Warnick cite are, besides being nonbinding in this jurisdiction, factually inapposite. *Hosanna–Tabor* expressed no view on whether the ministerial exception applies to contract and tort claims because those issues were not before the Court. Pennsylvania courts have clearly held that the ministerial exception applies to contract and defamation claims. *See Connor,* 975 A.2d at 1109; *see also Mundie v. Christ Church of Christ,* 987 A.2d 794, 802 (Pa.Super.Ct.2009); *Cooper v. Church of St. Benedict,* 954 A.2d 1216, 1219 (Pa.Super.Ct.2008) (the ministerial exception applies "to decisions made by religious institutions concerning employment of ministers"); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church,* 2005 WL 2455253, at *7 (E.D.Pa. Oct.5, 2005) ("The ministerial exception is not limited in application only to certain federal or state employment claims. Rather, because the ministerial exception is based on the First Amendment, it may apply to any federal or state cause of action that would otherwise impinge on the Church's prerogative to choose its ministers.").

*Warnick*, 2014 WL 11210513, at *10–11. The trial court further held:

> A civil court's consideration of Father Warnick's claims, which concern a church's selection of its minister, would be "excessive entanglement into church matters" barred by the First Amendment. *Mundie v. Christ Church of Christ,* 987 A.2d 794, 802 (Pa.Super.Ct.2009). Such consideration of any of his claims would intrude on sacred precincts. The deference rule and ministerial exception apply here, barring all of Father Warnick's claims.

*Warnick*, 2014 WL 11210513, at *11.

Rev. Lee's position is that the decision for the Court in this matter does not implicate any First Amendment issues because: (a) the Church voluntarily burdened its rights by entering into the Agreement; (b) Agreement subsections 12.3 (i) (serious offense) & (ii) (incapacity) provide the only cause for a termination of his employment; and (c) the Church does not contend these two subsections are the basis for Rev. Lee's termination, and therefore, no restriction on free exercise or prospect of excessive entanglement presents. He steadfastly ignores any basis for cause in the Agreement other than a serious offense or incapacity, such as the significant

language under § 12.3 governing termination for cause: material breach and other grounds for termination preserved. Even without the language on material breach or any provision for cause, Pennsylvania law would supply material breach as providing cause. As previously indicated, in the termination vote by the Congregation the Church specifically invoked as grounds for its termination decision Rev. Lee's failures in spiritual leadership, financial stewardship and in his responsiveness to Church leadership.[17] In final pursuit of his breach of contract claim, Rev. Lee cannot escape eventual judgment as to these bases urged by the Church for Rev. Lee's termination and cannot avoid the problems with autonomous church governance protected by the First Amendment.

Having buried the lead at the end of its supplemental brief, the Church therein closes in asserting that:

> [t]he Church regarded [Rev. Lee's] documented failings as a minister as sufficient cause to terminate his contract, and from a doctrinal and ecclesiastical viewpoint, such failings go to the ultimate function of, and need for, a minister of the Gospel *in the eyes of the Church*, and it is the Church's eyes that matter. Courts have held that even if there is an assertion of pretext in the decision given for dismissal of a minister, deference must be paid.

(Docket No. 90 at 13) (citing *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 F.2d 1354 (D.C. Cir. 1990). Under *Hosanna-Tabor*, the Church argues that if the Court finds that a material breach constitutes cause per the contract, then it may consider what the reasons are that the Church maintains constitute material breach, but it can go no further to delve into the underlying reasons for cause if they include matters of church doctrine or ecclesiastical rule as resolution of those matters is left to the Church alone. (Tr. 5/12/17at 35); (Docket No. 90 at 13).

---

[17] Agreement § 2.5, for example, provides the Pastor "shall work with the Deacons and CHURCH staff in achieving the Church's mission of proclaiming the Gospel to believers and unbelievers." (Docket No. 76-3).

## C. Materiality of Breach Presents Excessive Entanglement in this Matter

This Court determines that failures in spiritual and financial stewardship as well as failure to cooperate with Church leaders would constitute cause under the Agreement and Pennsylvania law. State law on materiality of breach provides that materiality can be decided as a matter of law, *Norfolk S. Ry. Co. Basell USA, Inc*., 512 F.3d 86, 92-93 (3d Cir. 2008), although it is ordinarily a question of fact for the jury. The bases urged by the Church for Rev. Lee's termination constitute a material breach of the Employment Agreement excusing the Church's obligation to perform under § 12.2 by providing salary and benefit payments to Rev. Lee. The cases on the ministerial exception and excessive entanglement counsel that even where in theory the matter of a religious institution's breach could be a question of fact for the jury, the ministerial exception and excessive entanglement might apply to prevent further consideration by the Court and/or jury depending on the reasons asserted by the religious institution for its alleged breach. *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.,* 450 F.3d 130, 138 (3d Cir. 2006), acknowledged in the labor practice setting, that "the very process of inquiry" into church motives and good faith as it relates to the mission of the church can impinge on rights guaranteed by the First Amendment.

Here, as to cause, the Court concludes that any determination whether Rev. Lee failed in his spiritual and financial stewardship and responsiveness to Church leaders is a matter best left to the Church alone. Otherwise, the Court and jury would need to probe how the Church evaluated spiritual success and leadership under its doctrine, which both the Agreement and By-laws reference in doctrinal terms. The financial stewardship issue, for example, also would require considering whether members and Church attendees decreased their giving in order to thwart Rev. Lee's continued ministry, as suggested by Rev. Lee in his deposition, (Docket No.

88-1 at 18-19)**,** or for spiritual reasons and whether and to what extent they were led by the Spirit in the great commission to bring souls to Christ, (Docket No. 76-4 at 13), also a prohibited ecclesiastical inquiry. Prohibited considerations of ecclesiastical hierarchy are directly implicated in the assessment that Rev. Lee did not adequately respond to Church leadership.

This Court does not interpret *Hosanna-Tabor* and *Petruska* as establishing a broader principle applied to matters involving ecclesiastical employment that so long as a church asserts that it has cause for termination of an employment contract that very uttered justification affects a *dénouement*. If this Court had agreed with Rev. Lee that the only permissible bases for termination with cause were those indicated in § 12.3(i) and (ii), the ministerial exception and excessive entanglement would not necessarily raise an insurmountable problem because the Church does not claim either § 12.3(i) and (ii) as the basis for its decision. Whether one *could* imagine scenarios involving Rev. Lee's termination by the Church that would not present thorny excessive entanglement problem,[18] such as if the case involved the Church contending Rev. Lee simply refused to present for work with Rev. Lee disputing same, *cannot* save Rev. Lee's claim from the excessive entanglement bar and the ministerial exception. Rev. Lee has been given a full and fair opportunity to show that his case does not require delving into doctrinal and ecclesiastical matters and church polity, but under the particulars of this church dispute, his showing fails. The material breach urged here—the threefold spiritual failures as determined by

---

[18] If the Church, for example, asserted that if it had offered § 12.3(i) or (ii) as the justification for Rev. Lee's termination, then First Amendment concerns would not prohibit the Court, and jury by extension, from considering the evidence regarding the proffered violation of law or incapacity to resolve the matter. The Church concedes that not all bases for material breach would prohibit the case from proceeding—it simply maintains that the reasons for material breach here do. Tr. at 34-35, 38. The Church, however, contends and the evidence supports that Rev. Lee's inadequate spiritual leadership and financial stewardship were material breaches of the Contract and were the reasons expressed by the Congregation for his termination. Not surprisingly, the Employment Agreement being between a Church and its head pastor is imbued throughout with religious doctrine and matters of ecclesiastical hierarchy, and the Church relies on these provisions in its defense.

the Congregation—pierces the very heart of ecclesiastical matters protected from intrusion by the courts. Accordingly, this Court must dismiss Rev. Lee's case.

Rev. Lee acknowledges that *Minker* instructed that where the matter involved inquiry into a church's reasons for not meeting its contractual obligations the case could present prohibited excessive entanglement. (Docket No. 91 at 9). *Minker* involved an alleged oral contract to provide a minister with a more suitable congregation. The appellate court in reversing the grant of a motion to dismiss, expressly cautioned "that the contract alleged by Minker threatens to touch the core of rights protected by the free exercise clause. We also agree that any inquiry into the Church's reasons for asserting that Minker was not suited for a particular pastorship would constitute an excessive entanglement in its affairs." 894 F.2d at 1360. *Minker* remarked:

> [i]t could turn out that in attempting to prove his case, appellant will be forced to inquire into matters of ecclesiastical policy even as to his contract claim. Of course, in that situation, a court may grant summary judgment on the ground that . . . pursuing the matter further would create an excessive entanglement with religion. . . . [W]hile the first amendment forecloses any inquiry into the Church's assessment of Minker's suitability for a pastorship, even for the purpose of showing it to be pretextual, it does not prevent the district court from determining whether the contract alleged by Minker in fact exists.

*Id.* at 1360.

Consistent with *Hosanna-Tabor* and *Petruska,* the Church, and not the Court or an empaneled jury, is the final arbiter of the particular bases for cause urged by the Church and considered by its Congregation. Otherwise, the Court and eventual jury would be entangled improperly in ecclesiastical matters. The Court agrees with *Minker's* remark on the matter: "[the Court] cannot imagine an area of inquiry less suited to a temporal court for decision; evaluation of the 'gifts and graces' of a minister must be left to ecclesiastical institutions." 894 F.2d at 1357. *See also Natal v. Christian Missionary Alliance,* 878 F.2d 1575, 1578 (1st

Cir.1989) ("By its nature, the inquiry which Natal would have us undertake into the circumstances of his discharge plunges an inquisitor into a maelstrom of Church policy, administration, and governance. It is an inquiry barred by the Free Exercise Clause."); *Kaufmann v. Sheehan*, 707 F.2d 355, 358 n.3 (8th Cir. 1983) ("[C]ivil courts are bound to accept the decisions of the highest judicatories of a religious organization . . . on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze . . . the ecclesiastical actions . . . must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church adjudicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits.").

The possible eventual problem that had not presented on the motion to dismiss in *Minker* is the very case presented at this stage in the litigation[19] and the reason why the case must be dismissed. Rev. Lee cannot show that this case can be resolved without interference with free exercise and without excessive entanglement. There is no question that Rev. Lee has had the opportunity to fully develop the record. Discovery has closed. The parties have been given a full opportunity to address the issues through briefing, (Docket No. 89), and at the May 12, 2017 hearing. Moreover, as shown above, the Court has vetted Rev. Lee's arguments from multiple vantages.

## VI.    CONCLUSION

---

[19] The Church initially indicated that "full development of the evidence" is required to properly judge whether the action is precluded on First Amendment grounds. (Docket No. 90 at 6). In the final sentence of its brief, however, the Church offers essentially that if the Court "is satisfied" that Rev. Lee has had the ability to fully develop the record, and on a motion for summary judgment filed by Rev. Lee it is indicated that Rev. Lee is satisfied with his opportunity, "then the case is ripe for dismissal at this time; if not, the decision must be made prior to the issue being submitted to the jury." *Id.* at 14. At the hearing, the Church finally posited that the matter is now at the stage where dismissal on First Amendment grounds would be appropriate. (Tr. 5/12/17 at 49-51).

Based on the foregoing, the Motion for Summary Judgment [73] filed by Plaintiff will be denied and Rev. Lee's claim will be dismissed under the ministerial exception and due to prohibited excessive entanglement issues preventing this matter from proceeding any further. Accordingly, judgment will be entered against Plaintiff, Rev. Dr. William David Lee, and in favor of Defendant, Sixth Mount Zion Baptist Church of Pittsburg d/b/a the Sixth Mount Zion Missionary Baptist Church. An appropriate order follows.

*s/Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: August 22, 2017

cc/ecf: All counsel of record